**Alba Nubia CORREA,**
**Petitioner–Appellant,**

v.

**Richard THORNBURGH, as de jure head of the Immigration & Naturalization Service; Immigration Court; The Board of Immigration Appeals, Respondents–Appellees.**

**No. 736, Docket 89–6199.**

United States Court of Appeals, Second Circuit.

Argued Jan. 26, 1990.

Decided April 20, 1990.

Irving Edelman, New York City (Leo E. Ypsilanti, New York City, of counsel), for petitioner-appellant.

Scott Dunn, Sp. Asst. U.S. Atty. (Andrew J. Maloney, U.S. Atty., Eastern District of New York, Robert L. Begleiter, Asst. U.S. Atty., of counsel), for respondents-appellees.

Before VAN GRAAFEILAND, MINER and WALKER, Circuit Judges.

WALKER, Circuit Judge:

This appeal comes to us from a denial by the United States District Court for the Eastern District of New York (Costantino, *Judge*) of a petition for a writ of habeas corpus, pursuant to 8 U.S.C. § 1105a(b), seeking a review of a final order of the Board of Immigration Appeals (BIA) excluding the petitioner-appellant, Alba Nubia Correa, from admission into the United States.

## BACKGROUND

On August 21, 1982, Correa, a citizen of Colombia, and an "alien" who had been "lawfully admitted for permanent residence" in the United States since February 14, 1981, sought to re-enter the United States at the Houston Intercontinental Airport following an international flight from Colombia via Guatemala.[1]

At the Houston airport, all processing at that time of arriving international passengers for customs, agriculture and immigration purposes was conducted in a restricted area closed to the general public commonly referred to as the "Customs Enclosure." Access to or exit from the area was controlled by exit control officers and the other inspecting officers of the United States Customs Service (Customs), Immigration and Naturalization Service (INS or Immigration) and Department of Agriculture (USDA).

Each incoming passenger was initially processed at a primary inspection station by a single Customs or INS inspector, who was cross-designated in order to act for both agencies. After preliminary questioning, the primary inspector would refer the passenger to a "red area" within the "Customs Enclosure" for a more intensive inspection, or to a "green area" still within the "Customs Enclosure." "Green area" referrals were permitted to proceed to the exit control station but were still subject to random selection for the more intensive "red area" inspection. The final stage in the inspection process occurred at the point of exit when the passenger presented the Customs declaration to the exit control officer. The exit control officer could either accept the declaration and permit the passenger to depart the "Customs Enclosure," or direct the passenger to the "red area" for further inspection.[2]

Events leading to Correa's arrest began on August 21, 1982, when another passenger, Maria Teresa Uribe, presented herself to Customs Inspector Kenneth W. Brown at the primary inspection station. Inspector Brown, cross-designated as an Immigration inspector, noticed that Uribe's passport revealed numerous trips to Colombia, which he knew to be a source country for drugs, with this most recent return to the United States taken via a circuitous route. He also observed that Uribe's style of dress, her manner, and her frequent trips abroad were peculiar for a person who

---

1. An "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3). "Lawfully admitted for permanent residence" is defined as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

2. The facts relating to the operation of the "Customs Enclosure" were not part of the administrative record. Correa's claim that she had "entered" the United States and thus could not be subject to an order of exclusion, to which these facts relate, was raised for the first time in the District Court.

claimed to be a maid. Inspector Brown decided to refer Uribe to the "red area" for a more intensive inspection.

As he was inspecting Uribe, Brown noticed Correa, waiting in another primary inspection line. Correa had arrived on the same flight as Uribe, appeared to be about her age and was similarly dressed. Inspector Brown knew that drug couriers frequently travelled in pairs and decided then to question Correa to determine if she was traveling with Uribe.

Inspector Brown escorted Uribe to the baggage carousel area, where she claimed her luggage and then to the "red area" inspection station. When they arrived there, Correa was already in the "red area". After going through the primary inspection area, Correa had been stopped by USDA agents before passing through the exit control station and had been sent to the "red area" for a more intensive agriculture inspection. After telling the USDA officers that he also wished to inspect Correa, Brown began a search of Uribe and discovered approximately one kilogram of cocaine hidden in her luggage. Uribe was arrested by Customs officers and turned over to the Houston Police Department.

Inspector Brown then turned his attention to Correa, whose agriculture inspection was completed and who was being detained by Inspector George Holt. Assisted by Inspectors Holt and Gail Osborne–Tanner, Brown searched Correa's luggage and found one kilogram of cocaine that he estimated to be worth one-million dollars. Like Uribe, Correa was arrested and turned over to the Houston Police Department. At that time Correa was also formally "paroled" into the United States for purposes of prosecution pursuant to 8 U.S.C. § 1182(d)(5)(A).[3]

From her arrival in the United States to the moment of her arrest, Correa was never free to leave the "Customs Enclosure". If she had attempted to leave, she would have been prevented from doing so by Inspector Brown, other Customs, Immigration or USDA officers, or the exit control officer.

On December 8, 1982, Correa was convicted in a Texas state court, after a jury trial, of possession with intent to distribute cocaine weighing at least 400 grams. The state court jury imposed a sentence of twenty-five years. On April 17, 1985, a Texas appeals court reversed Correa's conviction and remanded because of an improper jury instruction as to the applicable penalty range. On October 7, 1985, Correa pleaded no contest to the same charge and was given a term of five years probation with the adjudication of guilt to be deferred.

On May 28, 1986, the INS issued to Correa a Form I–122 charging her with being excludable from the United States pursuant to 8 U.S.C. § 1182(a)(23) (1982), as an alien "who an immigration officer knows or has reason to believe is or has been an illicit trafficker in narcotic drugs or marijuana."[4]

---

**3.** That section provides in pertinent part that:
The Attorney General may ... in his discretion parole into the United States temporarily ... any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien ... shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.
An alien paroled into the United States has not "entered" the United States for immigration purposes. *Siu Fung Luk v. Rosenberg,* 409 F.2d 555, 558 (9th Cir.), *cert. dismissed,* 396 U.S. 801, 89 S.Ct. 2151, 24 L.Ed.2d 38 (1969). *See also United States ex rel. Lam Hai Cheung v. Esperdy,*

345 F.2d 989, 990 (2d Cir.1965); *Wong Hing Fun v. Esperdy,* 335 F.2d 656, 657 (2d Cir.1964), *cert. denied,* 379 U.S. 970, 85 S.Ct. 667, 13 L.Ed.2d 562 (1965).

**4.** At the time the Form I–122 was issued, 8 U.S.C. § 1182(a)(23) provided for the exclusion of:
Any alien who has been convicted of a violation of, or a conspiracy to violate, any law or regulation relating to the illicit possession of or traffic in narcotic drugs or marihuana, or who has been convicted of a violation of, or a conspiracy to violate, any law or regulation governing or controlling the taxing, manufacture, production, compounding, transportation, sale, exchange, dispensing, giving away, importation, exportation ... of

On January 15, 1987, an exclusion hearing was held before an Immigration Judge. Correa was represented by counsel. At the hearing, Inspector Brown testified that based on the events at the airport, he believed that Correa was a trafficker in cocaine. Inspector Osborne–Tanner, who participated in the search of Correa, testified that based on Correa's demeanor during the search and the cocaine found in Correa's luggage, she also believed that Correa was a trafficker in cocaine. In an opinion dated January 27, 1987, the Immigration Judge, crediting the testimony of the officers, ordered Correa excluded from the United States pursuant to 8 U.S.C. § 1182(a)(23).

Correa appealed the finding of excludability to the BIA and, alternatively, requested remand to the Immigration Judge to enable her to apply for a waiver of excludability pursuant to 8 U.S.C. § 1182(c). Such a waiver is available at the discretion of the Attorney General to lawful permanent resident aliens who have kept a lawful unrelinquished domicile in the United States for seven consecutive years and can demonstrate that they are deserving of a waiver. Drug offenders must present a showing of unusual or outstanding countervailing equities to obtain a waiver, particularly if the grounds for exclusion involved trafficking in drugs. *Matter of Marin*, 16 I & N Dec. 581, 586 & n. 4 (BIA 1978).

On January 18, 1989, the BIA affirmed the Immigration Judge's excludability findings and denied Correa's request for a remand. The BIA noted that Correa's counsel conceded excludability at oral argument, a finding that Correa now challenges, but went on to uphold the Immigration Judge's findings on the merits. In denying Correa's request for a remand for consideration of a § 1182(c) waiver, the BIA concluded that such a waiver would be denied by the Immigration Judge in the exercise of her discretion, since Correa "does not have the kind of equities which could be described as outstanding to offset the serious nature of her crime."

On March 8, 1989, the INS instructed Correa to report to the Immigration authorities for her return to Colombia. She thereupon filed her petition for habeas corpus relief in the United States District Court for the Eastern District of New York, as she had taken up residence in Queens County, New York. Her departure has been postponed pending final disposition of her habeas petition.

## DISCUSSION

On appeal, Correa argues that the District Court erred in several respects in dismissing her petition: 1) that she had effected an "entry" into the United States and thus was entitled to deportation proceedings instead of exclusion proceedings; 2) that the Immigration Judge's finding of excludability, affirmed by the BIA, was based on the erroneous application of 8 U.S.C. § 1182(a)(23) to her case; 3) that, in being subjected to exclusion rather than deportation proceedings as a returning resident alien, she was deprived of her constitutional right to equal protection of the laws; and 4) that the BIA abused its discretion in denying her a waiver of excludability.

Some of these claims were not raised in the administrative proceedings and thus can be rejected on that basis. In any event, as is explained below, all are without merit.

opium, coca leaves, heroin, marihuana, or any salt derivative or preparation of opium or coca leaves, or isonipecaine or any addiction-forming or addiction-sustaining opiate; *or any alien who the consular officer or immigration officers know or have reason to believe is or has been an illicit trafficker in any of the aforementioned drugs;* (Emphasis added).

On October 27, 1986, 8 U.S.C. § 1182(a)(23) was amended by the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207, 3207–47, expanding the list of drugs for which an alien trafficker can be excluded. The amendment was effective as to aliens seeking entry after its enactment. On December 22, 1987, the statute was further broadened by amendment to make excludable aliens who knowingly assist, abet, conspire or collude with others in illicit drug trafficking. Sect. 806, Foreign Relations Authorization Act, Pub.L. No. 100–204, 101 Stat. 1331, 1399.

 Correa claims that on August 21, 1982, when she cleared the primary inspection station at the Houston airport, she effected an "entry" into the United States, and thus while deportation proceedings may have been appropriate, she could not have been subjected to exclusion proceedings.[5]

This claim was never raised by Correa either before the Immigration Judge or on appeal to the BIA.[6] The District Court in this habeas corpus proceeding apparently considered the issue *de novo*, thereby according Correa a benefit to which she was not entitled. *See Kessler v. Strecker*, 307 U.S. 22, 34–35, 59 S.Ct. 694, 700, 83 L.Ed. 1082 (1939); *United States ex rel. Tom We Shung v. Murff*, 176 F.Supp. 253, 256–57 (S.D.N.Y.1959) (Weinfeld, J.), *aff'd per curiam*, 274 F.2d 667 (2d Cir.1960). This claim should have been dismissed for failure to exhaust administrative remedies.

 Moreover, we note that the District Court's conclusion that Correa had not effected an "entry" and thus was subject to exclusion instead of deportation was clearly correct.

Title 8, United States Code, Section 1101(a)(13) defines "entry" as:

any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise ...

BIA case law, synthesized in *Matter of Pierre*, 14 I & N Dec. 467 (BIA 1973), has led to the formulation of a more precise test of whether an entry into the United States for immigration purposes has occurred:

An entry involves: (1) a crossing into the territorial limits of the United States, i.e. physical presence; (2)(a) an inspection and admission by an immigration officer or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

*Matter of Ching and Chen*, Interim Decision 2984, at 3 (BIA 1984); *see also Matter of Lin*, 18 I & N Dec. 219, 220 (BIA 1982); *Matter of Yam*, 16 I & N Dec. 535, 536–37 (BIA 1978); *Matter of Pierre*, 14 I & N Dec. 467, 468–69 (BIA 1973).

Applying this test to the events of August 21, 1982, it is evident that Correa never effected an entry. She satisfied the first prong, "physical presence," when she disembarked her Avianca flight from Guatemala to Houston. Regarding the second prong, "inspection and admission by an immigration officer," since she was allowed to pass the primary inspection station and was referred to the "red area" solely for an agriculture inspection, she was arguably

---

5. Deportation proceedings are generally more favorable to the alien than exclusion proceedings. Rights available in deportation but not exclusion include advance notice of the charges, a burden of proof placed on the government, direct appeal to the Court of Appeals, the right to seek suspension of the order, and the right to designate the country of destination. *See Landon v. Plasencia*, 459 U.S. 21, 26–27, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982); *Maldonado–Sandoval v. INS*, 518 F.2d 278, 280 n. 3 (9th Cir.1975) (per curiam); 2 Gordon & Mailman, *Immigration Law and Procedure*, § 3.18.

　Other than protection against gross physical abuse, the alien seeking initial entry appears to have little or no constitutional due process protection. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212–16, 73 S.Ct. 625, 629–31, 97 L.Ed. 956 (1953); *Landon*, 459 U.S. at 32, 103 S.Ct. at 329; *Lynch v. Cannatella, Jr.*, 810 F.2d 1363, 1374 (5th Cir.1987). Rights in such circumstances appear to be largely statutorily derived, *see Jean v. Nelson*, 727 F.2d 957, 968 (11th Cir.1984), *aff'd*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985); 2 Gordon & Mail-

man, *supra*, §§ 3.18–3.19, although some constitutional due process protection may be available to the resident alien seeking re-entry depending on the length of her absence. *See Landon*, 459 U.S. at 33–34, 103 S.Ct. at 329–30 (citing *Shaughnessy*); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596–600, 73 S.Ct. 472, 477–79, 97 L.Ed. 576 (1953).

6. Indeed, the BIA opinion states that counsel for Correa at oral argument "conceded the applicant is excludable." The BIA, nonetheless, went on to affirm the Immigration Judge's finding of excludability on the merits. While normally such a concession would bind Correa, we cannot exclude the possibility, as Correa argues here, that in view of the BIA's extensive discussion of the issue, the "concession", which contradicted the brief, was in the nature of an assumption predicating Correa's second argument that the case should be remanded to the Immigration Judge for consideration of a waiver of excludability pursuant to 8 U.S.C. § 1182(c).

"inspect[ed]" and "admit[ted]" by an immigration officer. On the other hand, the more compelling view is that Correa was subject to inspection at any time before passing through the "Customs Enclosure" exit control and her immigration inspection and admission were never completed. We need not resolve this point since it is clear that Correa never satisfied the third prong of the test—"freedom from official restraint."

 "Freedom from official restraint" means that the alien who is attempting entry is no longer under constraint emanating from the government that would otherwise prevent her from physically passing on. *See United States v. Vasilatos,* 209 F.2d 195, 197 (3d Cir.1954); *Lazarescu v. United States,* 199 F.2d 898, 900 (4th Cir. 1952). Although physical movement may evidence that such freedom has been acquired, *Matter of V–Q–,* 9 I & N Dec. 78, 79–80 (BIA 1960), it is not a necessary component as long as the alien is *free* physically to enter the United States openly or surreptitiously. *Vasilatos,* 209 F.2d at 197; *Lazarescu,* 199 F.2d at 900–01; *In Re Dubbiosi,* 191 F.Supp. 65, 66 (E.D.Va. 1961). Such restraint need not be by immigration officers. *Edmond v. Nelson,* 575 F.Supp. 532, 535 (E.D.La.1983) (aliens seeking entry by sea "restrained" by master of rescuing ship, acting pursuant to government regulations); *Matter of Yam,* 16 I & N Dec. 535, 536–37 (BIA 1978) (alien found at border and taken under guard by local police to a medical facility).

In the instant case, Correa was never free from official restraint prior to her arrest on August 21, 1982 and thus never

entered the United States. As Inspector Brown's uncontroverted affidavit makes clear, at all times during Correa's processing, she remained in a restricted area, known as the "Customs Enclosure", where access and egress were controlled by exit control officers, and by Customs, Immigration, and USDA officers assigned to the area.[7] Had she attempted to leave the enclosure, she would have been prevented from doing so by Inspector Brown, other Immigration, Customs or USDA officers, or the exit control officer. Petitioner was thus never free to physically enter the United States or to go at large and mix with the general population. *See Ex parte Chow Chok,* 161 F. 627, 629, 632 (C.C.N.D. N.Y.), *aff'd,* 163 F. 1021 (2d Cir.1908); *Lazarescu,* 199 F.2d at 900; *Vasilatos,* 209 F.2d at 197.

Petitioner's reliance on *Matter of V–Q–,* 9 I & N Dec. 78 (BIA 1960), in support of her claim that she "entered" the United States is misplaced. *Matter of V–Q–* involved an alien whom an inspector, after completing an inspection, had told to "go ahead" and who had proceeded 75 to 100 feet beyond the inspection point. The BIA concluded that since the inspector had lost custody over the alien, an entry had occurred thus necessitating deportation proceedings. *Id.* at 81. In Correa's case, custody was never lost.

 Correa next contends that she was not excludable pursuant to 8 U.S.C. § 1182(a) since "the conduct in which [she] was believed to have engaged did not and does not constitute trafficking within the

**7.** Relying on a section of the INS Operations Instructions manual entitled "One–Stop Inspection System," Correa asserts for the first time on appeal that she was free to leave the Customs Enclosure after passing through primary inspection without specific referral for further inspections. The manual states that "one-stop" is a system where a complete inspection of incoming passenger and baggage is conducted by one inspector at the primary area. If the applicant is determined by the primary inspector to be admissible, he is "free to exit the facility immediately"; if a determination is made that further inspection is necessary, the applicant is referred to Customs, INS, or both.

Correa is precluded from raising this issue for the first time on appeal. Even so, the argument is without merit. Correa has made no factual showing that the "one-stop" procedure was the one in operation at the Houston airport on the day she arrived. The evidence was wholly to the contrary. The Inspectors' uncontradicted testimony was that Correa was not "free to leave" after passing the primary inspector, and that each passenger was subject to further questioning and inspection up until the time that she passed through the exit control station.

meaning of the controlling statute." This argument is patently frivolous.

The Immigration Judge accepted the unrebutted testimony of Customs Officers Brown and Osborne–Tanner that they believed Correa to be a trafficker in cocaine and found their belief to be reasonable, based upon Correa's attempted entry into the country in undisputed possession of a kilogram of cocaine—an "amount too large for one's personal use" and too valuable to have been entrusted to a person unaware of its existence—and based further upon the officers' personal observations of Correa on August 21, 1982. These findings were supported by substantial evidence and are binding in this habeas corpus proceeding. 8 U.S.C. § 1105a(a)(4).

Correa further argues that Congress' 1987 amendment of 8 U.S.C. § 1182(a)(23), adding language that permits exclusion of an alien who the immigration officers know or have reason to believe "is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance", establishes that Correa must not have been covered by the earlier version, which speaks only of traffickers *per se* and not of aiders or abettors.[8] This argument is equally frivolous. It is premised upon Correa's *post hoc* claim that she was merely an "assister, abettor, conspirator or colluder with others" and thus not a trafficker. However, the finding of the Immigration Judge, based on ample evidence and affirmed by the BIA, was to the contrary.

■ Correa next argues that 8 U.S.C. § 1182(a)(23) works an unconstitutional deprivation of her right to equal protection because it subjects the resident alien, normally entitled to deportation proceedings, to exclusion proceedings based merely upon the alien's having temporarily trav-

elled abroad. We reject this argument as well.

■ Over no subject is the power of Congress more complete than it is over the admission of aliens. *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909). The power to expel or exclude aliens is a fundamental sovereign attribute exercised by the government's political departments largely immune from judicial control. *Fiallo v. Bell*, 430 U.S. 787, 794–96, 97 S.Ct. 1473, 1479–80, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel*, 408 U.S. 753, 766, 92 S.Ct. 2576, 2583, 33 L.Ed.2d 683 (1972); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952). Indeed, it may well be that Congress can bar aliens from entering the United States for discriminatory and arbitrary reasons, and that the usual constraints of rationality imposed by the equal protection clause do not limit the federal government's power to regulate immigration. *Matter of Longstaff*, 716 F.2d 1439, 1442–43 (5th Cir.1983), *cert. denied*, 467 U.S. 1219, 104 S.Ct. 2668, 81 L.Ed.2d 373 (1984).

Thus while there can be little doubt that our scope of review as to Correa's equal protection claim is exceedingly narrow, its precise outer boundaries are unclear. In any event, even under a traditional "rational basis" analysis, 8 U.S.C. § 1182(a)(23) easily satisfies constitutional requirements.

Congress has expressed particular concern about the tide of drugs entering the country and about drug offenders, *see Blackwood v. INS*, 803 F.2d 1165, 1168 (11th Cir.1986); *Guan Chow Tok v. INS*, 538 F.2d 36, 38–39 (2d Cir.1976), and has promulgated strong antidrug provisions, such as 8 U.S.C. § 1182(a)(23), in order to

---

**8.** Public Law 100–204 amended 8 U.S.C. § 1182(a)(23) to read in pertinent part:

"(A) has been convicted of a violation of, or a conspiracy to violate, any law or regulation of a State, the United States, or a foreign country relating to a controlled substance (as defined in section 102 of the Controlled Substance Act (21 U.S.C. 802)); or

(B) the consular officers or immigration officers know or have reason to believe is or has been an illicit trafficker in any such controlled substance or is or has been a knowing assistor, abettor, conspirator, or colluder with others in the illicit trafficking in any such controlled substance...."

exclude aliens that immigration officers have a reason to believe are involved in drug trafficking. This section is both a rational and necessary step to stem the flow of drugs into the United States, to prevent drug traffickers from entering the United States and to ensure the effective administration of immigration laws at the border.

 To hold otherwise would amount to granting a blanket exemption from the alien admission process to aliens previously granted permanent residency status who subsequently depart the United States voluntarily and thereafter seek to return. No authority is cited for this proposition. Rather, it is a basic principle of immigration law, with a limited exception not relevant here,[9] that a resident alien who leaves this country and attempts to enter the United States on his or her return, is subject to *all* current exclusionary laws. *Bonetti v. Rogers,* 356 U.S. 691, 698, 78 S.Ct. 976, 980, 2 L.Ed.2d 1087 (1958); *see also Landon v. Plasencia,* 459 U.S. 21, 25–28, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982). As petitioner was making an attempted entry on her return to the United States, she is subject to all of the exclusionary laws, including 8 U.S.C. § 1182(a)(23).[10]

 Finally, Correa argues that the BIA's denial of her application for a remand to the Immigration Judge, for consideration of a waiver of excludability under 8 U.S.C. § 1182(c), was error. This issue was not presented to the District Court in the habeas corpus petition and thus is not reviewable here. *Sales v. Harris,* 675 F.2d 532, 540 (2d Cir.), *cert. denied,* 459 U.S.

876, 103 S.Ct. 170, 74 L.Ed.2d 140 (1982); *Alexander v. Smith,* 582 F.2d 212, 217–18 (2d Cir.), *cert. denied,* 439 U.S. 990, 99 S.Ct. 589, 58 L.Ed.2d 664 (1978).

 In any event, the BIA acted well within its discretion in denying Correa's application to remand and reopen. *See INS v. Abudu,* 485 U.S. 94, 104–11, 108 S.Ct. 904, 911–15, 99 L.Ed.2d 90 (1988); *INS v. Bagamasbad,* 429 U.S. 24, 25–26, 97 S.Ct. 200, 201, 50 L.Ed.2d 190 (1976) (per curiam). In exercising its discretion, the BIA balanced the relevant factors as required by its own decisions. *See Matter of Buscemi,* Interim Decision 3058, at 7–8 (BIA 1988); *Matter of Marin,* 16 I & N Dec. 581, 585–86 (BIA 1978). The BIA found that the equities offered by Correa were "typical of those accrued by someone who has lived in the United States for seven years" and that "she has not shown any specific evidence of rehabilitation" and concluded that "she does not have the kind of equities which could be described as outstanding to offset the serious nature of her crime." The BIA also noted that Correa had "accrued her [requisite] seven years lawful permanent residence during the pendency of a meritless appeal." Thus, even if the remand denial had been properly raised in the District Court, it would have been error for that court to disturb it.

Judgment affirmed.

---

**9.** The only exception to this rule is the *Fleuti* doctrine, wherein a lawful permanent resident who makes a departure from the United States which is brief, casual and innocent, is not considered to be making an entry on return to the United States and therefore is not subject to the exclusionary provisions. *See Rosenberg v. Fleuti,* 374 U.S. 449, 452–62, 83 S.Ct. 1804, 1806–12, 10 L.Ed.2d 1000 (1963); *Landon v. Plasencia,* 459 U.S. 21, 28–29, 103 S.Ct. 321, 327, 74 L.Ed.2d 21 (1982); *see also Git Foo Wong v. INS,* 358 F.2d 151, 153 (9th Cir.1966). Since Correa's departure was not innocent, the *Fleuti* doctrine is inapplicable to this case. *See Palatian v. INS,* 502 F.2d 1091, 1093 (9th Cir.1974) (alien attempting to import 55 lbs. of marijuana); *Mat-*

*ter of Alvarez–Verduzco,* 11 I & N Dec. 625, 626–27 (BIA 1966) (alien attempting to import heroin).

**10.** Correa also argues that 8 U.S.C. § 1182(a)(23) should not be applied to her because if she had not left the United States, she could not have been deported for similar conduct, as there are no grounds for deportation comparable to the "reason to believe" standard for exclusion contained in 8 U.S.C. § 1182(a)(23). However, there is no requirement that exclusion and deportation grounds be analogous. *See Cabasug v. INS,* 847 F.2d 1321, 1326–27 (9th Cir.1988).