Lucina ROJAS–REYES, a/k/a Lucina
Mendoza, Petitioner,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

Docket No. 99–4131.

United States Court of Appeals,
Second Circuit.

Argued Oct. 23, 2000.

Decided Dec. 15, 2000.

Matthew L. Guadagno, Bretz & Coven, New York, NY, (Kerry William Bretz and Jules Coven, on the brief), for Petitioner.

Diogenes P. Kekatos, Assistant United States Attorney for the Southern District of New York, (Mary Jo White, United States Attorney for the Southern District of New York, and Aaron M. Katz and Gideon A. Schor, Assistant United States Attorneys for the Southern District of New York, on the brief), for Respondent.

Before FEINBERG, MINER, and SACK, Circuit Judges.

MINER, Circuit Judge:

Petitioner Lucina–Rojas Reyes ("Rojas") petitions for review of an order of the Board of Immigration Appeals ("BIA") denying her motion to reopen her deportation proceedings. Rojas entered the country illegally in 1987 and has worked and lived in Queens, New York since that time. Respondent Immigration and Naturalization Service ("INS") instituted deportation proceedings against Rojas with the service of an order to show cause on September 20, 1993. During those proceedings, Rojas applied for a form of relief from deportation then known as "suspension of deportation." In a decision rendered on March 4, 1996, an Immigration Judge ("IJ") denied Rojas' request for suspension of deportation, finding that her deportation would not result in extreme hardship either to herself or to a United States citizen family member. Rojas appealed the IJ's decision to the BIA.

In an order dated April 16, 1997, the BIA dismissed Rojas' appeal after determining that Rojas could not satisfy the statutory requirement of seven years' continuous physical presence in the United States. The BIA's decision was based on

an earlier decision in which it interpreted section 309(c)(5) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("the IIRIRA"), Pub.L. No. 104–208, Div. C, 110 Stat. 3009–546 (1996), as providing that an alien's accrual of residence in the United States for the purpose of determining eligibility for suspension of deportation ends on the date that the alien is served with an order to show cause. Several months after the BIA's dismissal of Rojas' appeal, the Attorney General vacated the BIA's decision that had interpreted the IIRIRA's accrual of residence provisions to apply to suspension of deportation applications pending on the IIRIRA's enactment date. Rojas thereafter moved the BIA to reopen her proceedings and address the merits of her suspension of deportation request. The BIA denied Rojas' motion, finding that she could not establish the required seven years of continuous physical presence in the United States under the methodology for determining time-in-residence established by section 203(a) of the Nicaraguan Adjustment and Central American Relief Act of 1997 ("the NACARA"), Pub.L. No. 105–100, Title II, 111 Stat. 2160, 2193–2201 (Nov. 19, 1997), *amended by* Pub.L. No. 105–139, 111 Stat. 2644 (Dec. 2, 1997).

For the reasons that follow, we deny the petition for review.

## BACKGROUND

On June 26, 1987, Rojas, a native and citizen of Mexico, entered the United States illegally at San Ysidro, California. Since her arrival in the United States, Rojas has resided in Queens, New York, with her husband, Eduardo Mendoza. For much of her time in this country, Rojas has been employed as a sewing machine operator at a factory owned by the Sun Industrial Company. Rojas has two children: a son, born in Mexico, and a daughter, born in the United States after Rojas' application for suspension of deportation had been heard and denied by an IJ.

On September 20, 1993, INS officials inspected Rojas' workplace and detained her. The INS thereafter issued an order to show cause charging that Rojas was deportable pursuant to the then-existing section 241(a)(1)(B) of the Immigration and Nationality Act ("the INA"). *See* 8 U.S.C. § 1251(a)(1)(B) (1994). During her deportation proceedings, Rojas did not challenge her deportability under the law, but rather applied for suspension of deportation, a form of relief that existed under the INA prior to recent revisions of that statute. Rojas also sought the right to leave the country voluntarily in lieu of deportation in the event that the IJ denied her suspension of deportation application.

On March 4, 1996, an IJ conducted a hearing on the merits of Rojas' application for suspension of deportation. In support of her suspension application, Rojas was allowed to offer the testimony of only one live witness other than herself. That witness, a neighbor and friend of Rojas', testified that Rojas had lived and worked in Queens since 1987, and that she believed Rojas to be a productive, generous, and honest citizen. In addition, Rojas testified on her own behalf and submitted the affidavits of several neighbors and coworkers. This evidence was offered to establish Rojas' continuous presence in the United States since 1987 and her good moral character. Rojas also submitted as evidence her tax returns for the years 1989 to 1994, a letter from her church, and a marriage certificate demonstrating that she was married in Mexico on December 16, 1992.

On the same day as the hearing, the IJ rendered a decision denying Rojas' application for suspension of deportation. The IJ's decision was based on his finding that Rojas had failed to demonstrate that "extreme hardship" either to herself or to a lawfully resident family member would result from her deportation, as required by the statute. To prove "extreme hardship," Rojas argued that, if deported, she would have difficulty finding employment in Mexico and thus would be unable to support

her family. Additionally, she argued that her son would suffer by being forced to move from the United States to Mexico. The IJ held that these averments amounted to "little in the way of hardship" and thus denied Rojas' application. On March 14, 1996, Rojas filed a timely appeal of the IJ's decision to the BIA, primarily challenging certain evidentiary rulings.

While Rojas' appeal to the BIA was pending, the first of several recent changes to the eligibility requirements for discretionary relief from deportation became effective when the IIRIRA was signed into law. Among other changes, the IIRIRA established a new methodology for determining the length of an alien's "continuous physical presence in the United States." After some initial uncertainty over whether the new rule applies to pre-IIRIRA suspension of deportation applications, the BIA held that it does apply in such cases. *See In re N–J–B–*, Int. Dec. No. 3309, 1997 WL 107593 (BIA Feb. 20, 1997) ("*N–J–B–*"). Applying its decision in *N–J–B–* to Rojas' case, the BIA dismissed her appeal in an order dated April 16, 1997. The BIA determined that the INS' service of an order to show cause on Rojas on September 20, 1993–nine months before the date on which Rojas claimed to have attained the required seven years' continuous physical presence in the United States—rendered Rojas ineligible for suspension of deportation under *N–J–B–*. Accordingly, the BIA ordered that Rojas voluntarily leave the country within thirty days.

On July 11, 1997, Rojas moved the BIA to stay its order of deportation and to reopen her case. In support of her motion, Rojas made two arguments: (1) that the Attorney General's recent vacatur of the BIA's *N–J–B–* decision once again made it unclear whether the IIRIRA's framework for determining the length of an alien's residence in the United States applied to suspension of deportation applications pending at the time of the IIRIRA's enactment; and (2) that the level of hardship that would result from her deportation was greater than it was at the time

of the IJ's decision in her case as a result of the birth of a United States citizen daughter and unspecified health problems that she and her daughter were suffering from.

On November 19, 1997, during the pendency of Rojas' motion to reopen, the NACARA was signed into law, amending the provision of the IIRIRA that purported to apply its rule for computing an alien's time-in-residence to suspension of deportation applications. Approximately a year and a half later, on April 15, 1999, the BIA issued a precedent decision in which it held that the IIRIRA, as amended by the NACARA, unambiguously demonstrated Congress' intent to apply the new rule for measuring time-in-residence to requests for suspension of deportation pending on the IIRIRA's effective date, April 1, 1997. *See In re Nolasco–Tofino*, 1999 WL 261565 ("*Nolasco–Tofino*").

In an order dated July 26, 1999, the BIA denied Rojas' motion to reopen her deportation proceedings. The BIA relied on *Nolasco–Tofino* and held that the IIRIRA's rule for determining the length of an alien's time-in-residence, as amended and clarified by the NACARA, applied to pre-IIRIRA suspension applications, and thus operated to terminate Rojas' accrual of time-in-residence on the date that she was served with the order to show cause. Rojas was served with an order to show cause on September 20, 1993, six years and three months after she entered the country from Mexico. The BIA therefore concluded that reopening her case was not warranted because she could not establish the seven years of continual physical presence in the United States required to be eligible for suspension of deportation. This petition for review followed.

## DISCUSSION

I. Specific Statutory Changes Affecting Rojas' Suspension of Deportation Application

On September 30, 1996, while Rojas' appeal was pending before the BIA, the

President signed the IIRIRA into law. The IIRIRA altered many aspects of the immigration laws, including the eligibility requirements for discretionary relief from deportation. The IIRIRA also established several new terms of art in immigration law, classifying as "removal" proceedings the previously separate "deportation" and "exclusion" proceedings, *see* IIRIRA § 304(a), 110 Stat. at 3009–587 (codified at 8 U.S.C. § 1229a), and replacing "suspension of deportation" with a new form of relief known as "cancellation of removal," *see id.* § 304(a)(3), 110 Stat. at 3009–587 (codified at 8 U.S.C. § 1229b). To be eligible for suspension of deportation under the INA before the enactment of the IIRIRA, a non-criminal applicant was required to demonstrate: (1) continuous physical presence in the United States for seven years preceding the application; (2) "good moral character"; and (3) that the applicant's deportation would, in the opinion of the United States Attorney General, cause "extreme hardship" to the applicant or to a United States citizen or lawful resident spouse, parent, or child of the applicant. 8 U.S.C. § 1254(a)(1) (1994). To qualify for cancellation of removal under the IIRIRA, aliens must satisfy stricter eligibility standards, including a longer period of residence in the United States, than were required for suspension of deportation under the former 8 U.S.C. § 1254(a)(1). *See* IIRIRA § 304(a)(3), 110 Stat. at 3009–587 (codified at 8 U.S.C. § 1229b(b)(1)).

The IIRIRA also contains a so-called "stop-time" rule, a provision that terminates an alien's accrual of time-in-residence upon the service of the charging document that initiates removal proceedings. *See id.* (codified at 8 U.S.C. § 1229b(d)(1)). The IIRIRA generally applies only to proceedings initiated on or after the statute's effective date of April 1, 1997. *See* IIRIRA § 309(c)(1), 110 Stat. at 3009–625 (codified at 8 U.S.C. § 1101 note). IIRIRA § 309(c)(5), however, contains a transitional rule that applies the stop-time provision to suspension applications submitted in deportation proceedings under prior law. That provision states:

> Transitional Rule With Regard To Suspension of Deportation.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to notices to appear issued before, on, or after the date of enactment of this Act [September 30, 1996].

IIRIRA § 309(c)(5), 110 Stat. at 3009–627.

Immediately following the enactment of the IIRIRA, the transitional rule's reference to "notices to appear" caused confusion in attempts to apply the rule to proceedings pending on the date of the statute's enactment. This confusion existed because the charging document known as a "notice to appear" serves to commence deportation proceedings initiated on or after the IIRIRA's effective date, whereas prior to the enactment of the IIRIRA, deportation proceedings were commenced by service of a charging document called an "order to show cause." 8 U.S.C. § 1229(a)(1); 8 U.S.C. § 1252b(a)(1) (1994). In *N–J–B–*, 1997 WL 107593, the BIA held that, despite the ambiguity of IIRIRA § 309(c)(5), Congress nevertheless intended the transitional stop-time rule to apply to cases pending on the IIRIRA's enactment date, and that the stop-time rule thus operated to terminate a suspension applicant's accrual of time-in-residence as of the issuance of a pre-IIRIRA order to show cause.

On July 12, 1997, the Attorney General vacated the BIA's decision in *N–J–B–* and certified to herself the issue of the effect of the stop-time rule on applications for suspension of deportation pending at the time of the IIRIRA's enactment. *See* Int. Dec. No. 3415, 1999 WL 1390344 (BIA Aug. 20, 1999). On November 19, 1997, while Rojas' motion to reopen was pending and before the Attorney General had ruled on the scope of IIRIRA § 309(c)(5), the President signed the NACARA into law. *See*

Pub.L. No. 105–100, 111 Stat. 2160 (Nov. 19, 1997), *amended by* Pub.L. No. 105–139, 111 Stat. 2644 (Dec. 2, 1997). Ratifying the BIA's decision in *N–J–B–*, the NACARA provides that the IIRIRA's stop-time rule applies to orders to show cause issued before September 30, 1996. Specifically, the NACARA replaced the words "notices to appear" in IIRIRA § 309(c)(5) with "orders to show cause." NACARA § 203(a)(1), 111 Stat. at 2196. After the NACARA's clarification, the transitional rule of IIRIRA § 309(c)(5) reads:

> Transitional Rule With Regard To Suspension of Deportation.—Paragraphs (1) and (2) of section 240A(d) of the Immigration and Nationality Act (relating to continuous residence or physical presence) shall apply to orders to show cause issued before, on, or after the date of enactment of this Act [September 30, 1996].

IIRIRA § 309(c)(5), 110 Stat. 3009–627 (1996), *amended by* NACARA § 203(a), 111 Stat. 2160, 2196 (Nov. 19, 1997), *further amended by* Pub.L. No. 105–139, 111 Stat. 2644 (Dec. 2, 1997) (codified at 8 U.S.C. § 1101 note).

On April 15, 1999, the BIA issued a decision construing the transitional rule of IIRIRA § 309(c)(5) as clarified by the NACARA amendments. *See In re Nolasco–Tofino*, Int. Dec. No. 3385, 1999 WL 261565 (BIA April 15, 1999). In *Nolasco–Tofino*, the BIA held that the plain language of the revised section 309(c)(5) was unambiguous, and that the title "Transitional Rule With Regard To Suspension of Deportation," coupled with the amended references to "orders to show cause," demonstrated Congress' intent to apply the stop-time rule to all requests for suspension of deportation pending on April 1, 1997. *See id.* The BIA based its July 7, 1999 order dismissing Rojas' motion to reopen her suspension of deportation proceedings on the amended IIRIRA § 309(c)(5) as interpreted in *Nolasco–Tofino.*

## II. Rojas' Arguments in this Petition for Review

■ In this petition, Rojas challenges the constitutionality of IIRIRA § 309(c)(5) as applied to suspension of deportation proceedings pending at the time of the IIRIRA's enactment. Rojas argues that the application of section 309(c)(5)'s stop-time rule to her case violates her rights to substantive as well as procedural due process guaranteed by the Fifth Amendment.[1] Additionally, Rojas contends that the Attorney General's failure to promulgate certain regulations under IIRIRA § 309(c)(3), that she alleges would benefit her, violates her rights to due process and equal protection of the laws. Lastly, Rojas urges that it is the fault of the Attorney General that these regulations have not been promulgated in a timely fashion, and that the INS should therefore be estopped from opposing Rojas' motion to have her BIA appeal heard on the merits.

### A. Constitutional Challenges

■ As we review Rojas' constitutional arguments, we must bear in mind that

---

1. Rojas does not contend in this petition that the transitional stop-time rule of IIRIRA § 309(c)(5) is inapplicable to her suspension of deportation application. In any event, we find that IIRIRA § 309(c)(5) is retroactive and that it applies to Rojas' suspension application. Section 309(c)(5) is retroactive—as that term has been defined by the Supreme Court—because by ending an alien's accrual of time-in residence on the date of service of an order to show cause or a notice to appear, it "attaches new legal consequences to events completed before its enactment." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Section 309(c)(5) applies to Rojas' case because "the presumption against retroactive legislation," *id.* at 265, 114 S.Ct. 1483, is overcome where "Congress ha[s] made clear its intent" that the law apply retroactively, *id.* at 270, 114 S.Ct. 1483. By stating that the stop-time rule "shall apply to orders to show cause issued *before, on, or after* the date of enactment of [the IIRIRA]" (emphasis added), section 309(c)(5), as amended by NACARA § 203(a)(1), clearly expresses Congress' intent that the stop-time rule apply retroactively.

"Congress deserves special deference in the area of immigration and naturalization." *Skelly v. INS*, 168 F.3d 88, 91 (2d Cir.1999). Indeed, " 'over no subject is the power of Congress more complete than it is' over the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977) (quoting *Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339, 29 S.Ct. 671, 53 L.Ed. 1013 (1909)). "[T]he power to expel or exclude aliens [i]s a fundamental sovereign attribute exercised by the [g]overnment's political departments largely immune from judicial control." *Fiallo*, 430 U.S. at 792, 97 S.Ct. 1473 (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953)). Because of this deference to Congress in the immigration area, the "precise outer boundaries" of our review are unclear. *Correa v. Thornburgh*, 901 F.2d 1166, 1173 (2d Cir.1990). In any event, the most exacting level of scrutiny that we will impose on immigration legislation is rational basis review. *See id.* Under this review, legislation will survive a constitutional challenge so long as there is a "facially legitimate and bona fide reason" for the law. *Fiallo*, 430 U.S. at 794, 97 S.Ct. 1473; *see also Skelly*, 168 F.3d at 91. Additionally, "because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged [law] actually motivated the legislature." *Federal Communications Comm'n v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993).

## 1. Substantive Due Process

Rojas' first contention in this petition is that applying the IIRIRA's stop-time rule to suspension of deportation applications pending at the time of the IIRIRA's enactment works an unconstitutional violation of her substantive due process rights. Rojas contends that both the stop-time rule and its retroactive application must be supported by legitimate legislative purposes, and that "[a] purpose that supports a law's

prospective characteristics is not sufficient ... to support the application of the law retroactively." Petitioner's Brief at 17. Because Congress did not expressly articulate its reasons for applying the stop-time rule to suspension applications pending upon the IIRIRA's enactment, Rojas argues that the retroactive application of the stop-time rule is unconstitutional.

■ Before turning our attention to the rationality of the challenged legislation, we note that Rojas' argument is based on a misunderstanding of the type of judicial scrutiny applied to retroactive laws and a disregard for the deference with which we view immigration legislation. Rojas' assertion that the legislative purpose supporting a law's retroactive application must be different from the purpose supporting its prospective application is based on a misinterpretation of the Supreme Court's statements in two cases involving due process challenges to laws that apply retroactively. In the first case, *Usery v. Turner Elkhorn Mining Co.*, the Court explained that "[t]he retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter *may not* suffice for the former." 428 U.S. 1, 17, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (emphasis added). In the second case, *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 730, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), decided eight years later, the Court expanded on its earlier statement by noting that the burden facing retroactive legislation "is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose." These cases do not support Rojas' argument. The Supreme Court's statements in *Pension Benefit Guaranty* and *Turner Elkhorn* make clear that the legislative purpose can be the same for a law's prospective and retrospective aspects; the purpose need only be rational in both applications to be constitutional. The test therefore is one of rationality as applied independently to the pro-

spective and retrospective aspects of the law. *See. Davon, Inc. v. Shalala,* 75 F.3d 1114, 1123 (7th Cir.1996) ("[P]laintiffs ignore the true import of the Court's language. Far from saying that the retroactive aspects of legislation are subject to heightened scrutiny, the Court stated that both the retroactive and the prospective aspects are subject to the test of due process.").

■ Applying this principle here, we find that the stop-time rule of 8 U.S.C. § 1229b(d)(1) and the transitional stop-time rule of IIRIRA § 309(c)(5) are rationally related to the achievement of a legitimate government purpose. It appears that Congress enacted the stop-time rule to eliminate the incentive for aliens to delay their deportation proceedings in order to attain the seven years of continuous residence in the United States required to be eligible for suspension of deportation. *See* S.Rep. No. 104–249, at 15 (1996) (noting that the rule "[r]educes an alien's incentive to delay an exclusion or deportation proceeding by providing that the 7–year period of U.S. residence ... no longer includes the time after proceedings have begun"); H.R.Rep. No. 104–469(I), at 122 (1996) ("Suspension of deportation is often abused by aliens seeking to delay proceedings until 7 years have accrued."). Such delay was encouraged prior to the IIRIRA because aliens continued to accrue time-in-residence while their deportation proceedings were pending. This purpose—eliminating the incentive for aliens to delay their deportation proceedings—is clearly a legitimate one, particularly given Congress' broad sway in legislating in the immigration and naturalization area. Moreover, this purpose is rationally furthered by the stop-time rule of 8 U.S.C. § 1229b(d)(1). By ending the accrual of time-in-residence on the date an alien is served with either a notice to appear or an order to show cause, Congress has removed any incentive for an alien to delay deportation proceedings in the hope of attaining the required time-in-residence.

The same purpose that supports the stop-time rule of 8 U.S.C. § 1229b(d)(1) supports the transitional stop-time rule of IIRIRA § 309(c)(5). Indeed, applying the stop-time rule to pre-IIRIRA cases is eminently logical in light of Congress' intent in enacting the stop-time rule in the first instance. That is, it appears that Congress enacted the transitional stop-time rule of IIRIRA § 309(c)(5) to immediately address the problem of aliens intentionally delaying their deportation proceedings that it sought to remedy in future deportation cases with the stop-time rule of 8 U.S.C. § 1229b(d)(1). That purpose is a legitimate one and it is certainly furthered by applying the stop-time rule to suspension of deportation applications pending at the time of the IIRIRA's enactment.

■ Next, Rojas' assertion that IIRIRA § 309(c)(5) violates her substantive due process rights because the law's justification is irrational *as applied to her* also fails. Because she had already attained the required seven years of continuous physical presence in the country at the time of the IIRIRA's enactment, Rojas contends that Congress' concern about delay in deportation cases is inapplicable in her case. Thus, Rojas argues that "it is irrational to apply the law to her" and that we should decline to do so. This argument misunderstands the nature of rational basis review, in which acts of Congress are "accorded a strong presumption of validity," *Heller v. Doe,* 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993), and need not result in the most just or logical result in every case to pass constitutional muster, *see id.* at 321, 113 S.Ct. 2637 ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.") (internal quotation marks omitted). To the contrary, a law will be upheld under rational basis review "if any reasonably conceivable state of facts" could demonstrate that the statute is rationally related to a legitimate government purpose. *Id.* at 320, 113 S.Ct.

2637 (internal quotation marks omitted). This is the standard of review because the judicial system has long recognized that "[t]he problems of government are practical ones and may justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Id.* at 321, 113 S.Ct. 2637 (internal quotation marks omitted).

IIRIRA § 309(c)(5) was based on the generalization that aliens in deportation proceedings at the time of the IIRIRA's enactment had an incentive to delay those proceedings so that they could attain the required length of residence in this country to qualify for suspension of deportation. "Even though the generalization may not apply in [Rojas'] exact case and even though there may be more precise generalizations Congress could have chosen, those circumstances alone do not suggest [a constitutional] violation in this case." *Skelly,* 168 F.3d at 92; *cf. id.* ("Just as a particularly mature fourteen-year-old could not argue successfully that a state's minimum driving age violates the equal protection clause, so is [petitioner] precluded from making a similar argument [here]."). Accordingly, we join the three other circuit courts of appeal that have considered this issue, and hold that the application of IIRIRA § 309(c)(5) does not violate an alien's substantive due process rights. *See Afolayan v. INS,* 219 F.3d 784, 789 (8th Cir.2000); *Gonzalez–Torres v. INS,* 213 F.3d 899, 903 (5th Cir.2000); *Appiah v. United States INS,* 202 F.3d 704, 710 (4th Cir.2000).

### 2. Procedural Due Process

■ Additionally, Rojas argues that the BIA's denial of her motion to reopen violates her right to procedural due process. Rojas asserts that by paying the required fees when filing her application for suspension of deportation and motion to reopen, she obtained a constitutional right to have her suspension application evaluated by the BIA "on the merits," despite its facial failure to allege the required seven years of continuous physical presence in the United States. For the reasons that follow, we disagree.

■ The requirements of procedural due process apply only to the deprivation of interests encompassed within the Fifth Amendment's protection of life, liberty and property. *See Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). When protected interests are implicated, the right to a hearing is paramount. *See id.* at 569–70, 92 S.Ct. 2701. In immigration cases, the Due Process Clause requires only that an alien receive notice and a fair hearing where the INS must prove by "clear, unequivocal, and convincing" evidence that the alien is subject to deportation. *Woodby v. INS,* 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

Even if Rojas had a constitutionally protected interest in the adjudication of her suspension of deportation application, a matter that is not well-settled, *compare Tefel v. Reno,* 180 F.3d 1286, 1299–302 (11th 1999) (holding that an alien does not have procedural due process rights in connection with a suspension of deportation application), *with Larita–Martinez v. INS,* 220 F.3d 1092, 1095 (9th Cir.2000) (holding that a suspension of deportation applicant has a procedural due process right to have the BIA review all relevant evidence), we find her claim to be without merit because she received a full and fair review of her suspension application by the IJ and by the BIA on appeal. Specifically, Rojas *had a hearing* before an IJ on her suspension of deportation application. At that hearing, she submitted evidence, presented a witness, and testified herself. Moreover, Rojas' appeal and her motion to reopen her proceedings were adequately considered by the BIA. That the BIA rejected her arguments because she failed to satisfy a prerequisite to obtaining suspension of deportation relief does not amount to a constitutional violation. We therefore reject Rojas' procedural due process argument.

### 3. Constitutional Claims Related to "Repapering"

██ Rojas also contends that the Attorney General's failure to promulgate regulations providing for the conversion of pending suspension of deportation applications into applications for cancellation of removal under the IIRIRA violates her rights to due process and equal protection of the laws. Because we find no reason to believe that the Attorney General has abused the discretion vested in her by Congress over this matter, we find Rojas' argument to be without merit.

IIRIRA § 309(c)(3) provides as follows:

(3) ATTORNEY GENERAL OPTION TO TERMINATE AND REINITIATE PROCEEDINGS.—In the case described in paragraph (1) [deportation or exclusion cases pending on the IIRIRA's enactment date], the Attorney General may elect to terminate proceedings in which there has not been a final administrative decision and to reinitiate proceedings under [the IIRIRA]. Any determination in the terminated proceeding shall not be binding in the reinitiated proceeding.

IIRIRA § 309(c)(3), 110 Stat. at 3009–626 (codified at 8 U.S.C. § 1101 note).

The discretionary reinitiation of proceedings provided for in IIRIRA § 309(c)(3) is known as "repapering." In these repapered cases, the NACARA provides that the IIRIRA's general stop-time rule is inapplicable. *See* NACARA § 203(a)(1), 111 Stat. at 2196 (codified at 8 U.S.C. § 1101 note). The effect of these provisions is to render aliens who would otherwise be ineligible for suspension of deportation relief by virtue of the stop-time rule, eligible for cancellation of removal relief provided they can satisfy the good moral character and hardship requirements.

At present, the Attorney General apparently is on the verge of promulgating regulations that will allow non-lawful permanent residents who have not been issued a final administrative order of deportation to request repapering. In accordance with these expected regulations, the INS has decided to "administratively close the proceeding of any alien who appears eligible for ... repapering." Memorandum of Lori L. Scialabba, Petitioner's Brief, Exhibit C. Such closure would have the effect of foreclosing final orders of deportation in pending cases and allow those eligible for repapering to apply for cancellation of removal under the IIRIRA. If the Attorney General's final regulations on repapering are promulgated in the form anticipated by the Executive Office of Immigration Review, Rojas would be eligible for repapering but for the fact that a final order of deportation has been entered in her case.

Rojas contends that the Attorney General's failure to promulgate the expected repapering regulations to this point violates her due process rights. Specifically, Rojas argues that section 309(c)(5) combined with IIRIRA § 309(b)'s general command that the Attorney General promulgate regulations to carry out the IIRIRA no later than thirty days after the statute's enactment mandate a finding that the repapering regulations are overdue and that she has been prejudiced as a result.

Rojas' argument fails because IIRIRA § 309(c)(3) confers complete discretion on the Attorney General regarding whether to repaper a particular case. Indeed, that provision states that "the Attorney General *may*" terminate pre-IIRIRA deportation proceedings and reinitiate them as removal proceedings under the IIRIRA. *See* IIRIRA § 309(c)(3) (emphasis added). The fact that the Attorney General did not terminate Rojas' deportation proceedings before a final order was entered in her case does not violate section 309(c)(3). The Attorney General's decision not to promulgate repapering regulations to this point violates neither Rojas' due process rights nor her right to equal protection of the laws. Because the statute simply does not mandate repapering regulations, but rather vests the decision whether to con-

vert pending suspension of deportation cases into cancellation of removal cases in the Attorney General alone, Rojas has no right—either statutory or constitutional—to have her case repapered.

 Moreover, even if the IIRIRA compelled the Attorney General to promulgate repapering regulations—which it plainly does not—we do not believe that Rojas would have a private right of action to enforce that provision. *See, e.g., Thye v. United States,* 109 F.3d 127, 129 (2d Cir.1997) (per curiam) ("Statutory provisions that are phrased as general prohibitions or commands to federal agencies are unlikely to give rise to private rights of action .... [and] it is even more unlikely that ... discretionary language ... could support finding a private right of action by implication."). Finally, Congress' decision in IIRIRA § 309(c)(3) to exclude cases in which a final order of deportation has been entered from cases eligible for repapering does not violate Rojas' right to equal protection of the laws. Far from being irrational, it "appears simply to be a permissible legislative generalization born of the legitimate aim of saving resources," *Skelly,* 168 F.3d at 91, and as such it is not unconstitutional. For these reasons, we reject Rojas' constitutional challenges to the IIRIRA's repapering provision and the Attorney General's exercise of her discretion thereunder.

B. Estoppel

 Lastly, Rojas asserts that the INS should be estopped from opposing her motion to reopen her case by reason of the "unnecessary" delay in promulgating repapering regulations. "The doctrine of equitable estoppel is not available against the government 'except in the most serious of circumstances,' *United States v. RePass,* 688 F.2d 154, 158 (2d Cir.1982), and is applied 'with the utmost caution and restraint,' *Estate of Carberry v. Commissioner of Internal Revenue,* 933 F.2d 1124, 1127 (2d Cir.1991)." *Drozd v. INS,* 155 F.3d 81, 90 (2d Cir.1998). Specifically,

estoppel will only be applied upon a showing of "affirmative misconduct" by the government. *Id.*

Applying these principles here, we find that Rojas has not made the necessary showing. While the Attorney General and the INS have not yet promulgated repapering regulations, the Attorney General was not required to promulgate repapering regulations at all, *see* IIRIRA § 309(c)(3), 110 Stat. 3009–626 ("the Attorney General *may* elect" to repaper certain cases) (emphasis added), and her failure to do so constitutes a legitimate exercise of her discretion. Thus, Rojas has not proved the required affirmative misconduct on the part of the Attorney General to justify invocation of the estoppel doctrine. We therefore decline to apply the doctrine here.

## CONCLUSION

In accordance with the foregoing, the petition for review is denied.