## MATTER OF Z-

### In Exclusion Proceedings

### A-72969131

*Decided by Board October 5, 1993*

(1) Under the precedent decisions of the Board of Immigration Appeals, an "entry" into the United States under section 101(a)(13) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(13) (1988), requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2) (a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint.

(2) In exclusion proceedings where the alien has no colorable claim to lawful permanent resident status, the burden of proof is upon the alien to show that he has effected an entry and that exclusion proceedings are therefore improper.

(3) The Board found that the alien had made an entry into the United States when he debarked from his vessel at a place not designated as a port of entry and fled into the interior undetected, with every apparent intention of evading immigration inspection.

(4) The mere fact that the applicant entered an area which was under federal jurisdiction for reasons unrelated to immigration processing does not establish that he was under "official restraint" and does not render his movement something less than an entry.

EXCLUDABLE: Act of 1952—Sec. 212(a)(7)(A)(i)(I) [8 U.S.C. § 1182(a)(7)(A)(i)(I)]—
No valid immigrant visa

ON BEHALF OF APPLICANT:
Cathy H. Tao, Esquire
261 South Figueroa Street, Suite 205
Los Angeles, California 90012

ON BEHALF OF SERVICE:
Elena Kusky
General Attorney

BY: Milhollan, Chairman; Dunne, Morris, Vacca, and Heilman, Board Members

In a decision dated July 19, 1993, an immigration judge found that the applicant was not properly in exclusion proceedings under section 235(b) of the Immigration and Nationality Act, 8 U.S.C. § 1225(b) (1988), and he therefore terminated the proceedings. The Immigration and Naturalization Service appealed. The appeal will be dismissed.

The applicant is a male native and citizen of the People's Republic of China. He arrived at the shores of the United States in the early morning hours of May 24, 1993, on a cargo ship with about 200 compatriots. He came ashore with no proper entry documents and was apprehended later in the morning of the same day somewhere in the vicinity of Fort Point, the Presidio, and the Golden Gate National

Recreation Area in San Francisco, California. The Service issued him a Notice to Applicant For Admission Detained for Hearing Before Immigration Judge (Form I-122), alleging that he was excludable under section 212(a)(7)(A)(i)(I) of the Act, 8 U.S.C. § 1182(a)(7)(A)(i)(I) (Supp. IV 1992).

During the proceedings below, the applicant, through counsel, moved for termination of the exclusion proceedings on the ground that he had made an entry into the United States, and that exclusion proceedings were therefore improper. The immigration judge granted the motion, and the Service appealed.

The sole issue on appeal is whether the applicant made an "entry" into the United States, as that term is interpreted under the Immigration and Nationality Act. If he did so, exclusion proceedings, which are instituted to prevent or control such entry, are not authorized and must be terminated.

Section 101(a)(13) of the Act, 8 U.S.C. § 1101(a)(13) (1988), defines "entry" for immigration purposes, in relevant part, as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntary or otherwise." This Board, in addressing the more specific questions of whether a given case involves an "entry," has formulated a more precise definition of this term. Under our precedent decisions, an "entry" requires: (1) a crossing into the territorial limits of the United States, i.e., physical presence; (2) (a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. *Matter of Patel*, 20 I&N Dec. 368 (BIA 1991), and cases cited therein.

In the instant case, the Service contends that no entry has been shown. The Service argues, first, that the alien's intent to evade inspection at the nearest inspection point has not been established, and second, that the applicant was, at all relevant times prior to debarkation and thereafter, under official restraint. We disagree.

The circumstances of the applicant's arrival in the United States are established by the documents submitted by both the applicant and the Service. The applicant himself did not testify.

The applicant came to the shores of the United States aboard a vessel known as the *Pai Sheng*, a cargo ship under the Honduran flag with a crew of 10 and a "cargo" of passengers numbering about 200. At around midnight on the night of May 23, 1993, the *Pai Sheng* took an irregular course outside of normal lanes of shipping and slipped beneath the Golden Gate Bridge in San Francisco, California. As the vessel made its unauthorized approach, it was radar-monitored by an officer of the United States Coast Guard. The officer observed that the vessel was behaving in a suspicious manner and notified other federal

agencies in an attempt to get an investigation underway. Meanwhile, the *Pai Sheng* apparently moored at the first available dock inside the bay, a dock at Fort Point which was no longer in general use.

The passengers on board the *Pai Sheng* disembarked at the dock at approximately 1 a.m. on Wednesday, May 24, 1993. At the time of debarkation there were no officers of the Service nor officers of any other enforcement agency on hand at the dock. Thus, the applicant's debarkation went unwitnessed by any United States official. Upon debarkation, the aliens entered the Golden Gate National Recreation Area, Fort Point, and the Presidio, a military base area abutting the Golden Gate Bridge. At this time the area was closed to the public, as it typically was from dusk until after dawn.

At about 1:18 a.m., information from a Coast Guard officer regarding the *Pai Sheng* was relayed to an officer of the United States Department of the Interior Park Police. The Coast Guard officer advised that the vessel was suspicious and had docked at or near the Old Coast Guard Station on the south side of San Francisco Bay, close to the Golden Gate Bridge.[1] However, when the Park Police officer arrived, the vessel was already outbound, passing under the Bridge. No one was at or near the dock.

A short time later, between 1:18 a.m. and 1:45 a.m., United States Military Police from the Presidio stopped a pickup truck at a considerable distance from the docks to investigate a vehicle equipment violation. In the truck were either seven or nine undocumented Chinese immigrants. According to the Park Police report, the driver of the truck indicated that he had picked up the aliens a mile or 2 back, by prearrangement, because he had been promised payment in exchange for delivering them to a location in downtown San Francisco.

At approximately 2 a.m., a Park Police officer observed 50 to 150 more suspected undocumented aliens in a Fort Point parking lot. They were entering a dozen or so private vehicles. Upon the officer's approach, the subjects fled the vehicles and scattered into the nearby woods and hills, while most of the drivers sped away. Four of the vehicles remained and apparently were abandoned. The officer called for assistance, and a coordinated enforcement operation began.

The record reflects that by 10 a.m. on May 24, 1993, officers of the United States Park Service Police, the Golden Gate Bridge Police, Military Police from the Presidio military base, and security officers from a local United States Veterans Administration Hospital had placed in custody 170 of the former passengers of the *Pai Sheng*.

The record further reflects that the aliens apprehended during the

---

[1] Evidently, no one was certain whether the vessel had docked at the Old Coast Guard Station or at the nearby abandoned dock at Fort Point.

foregoing operation were not all apprehended in the same place, but were broadly dispersed. A United States Department of the Interior Park Police Incident Report, which was submitted for the record by both parties, states that the "subjects were rounded up from as far away as the Great Meadow, Lincoln Park, Clement St. and the Golden Gate Bridge." Further, 12 aliens from the *Pai Sheng* were apprehended by the San Francisco Police Department after people in residential areas of the city had complained of aliens in their back yards. Another *Pai Sheng* passenger was apprehended at a coffee shop in San Francisco three blocks south of the boundary of the Presidio.

The applicant and the other former passengers of the *Pai Sheng* were taken to a building beneath the Golden Gate Bridge to be held until the Immigration and Naturalization Service could effect their immigration processing. The Service issued the applicant a Form I-122, thus commencing these exclusion proceedings. The applicant was alleged to be excludable as an intending immigrant without proper entry papers, in violation of section 212(a)(7)(A)(i)(I) of the Act.

Later the same day, the Coast Guard intercepted the *Pai Sheng* about 45 miles from San Francisco. The vessel returned to the Bay. According to the affidavit of a Service officer submitted for the record, the vessel's crew were questioned, and some of them agreed to give statements. These statements, and the circumstances under which the ship had operated, indicated to the officer that the *Pai Sheng* was involved in an organized smuggling operation in which 200 or more Chinese immigrants were brought to the United States and delivered without immigration papers, in a manner similar to that of other smuggling operations in the officer's recent experience.

On the basis of the foregoing, the immigration judge found that the applicant had actually and intentionally evaded inspection, had proceeded into the United States free from official restraint, and had thereby effected an entry. The immigration judge therefore terminated the exclusion proceedings.

On appeal, the Service correctly points out that the burden of proof to show that the exclusion proceedings are not proper is upon the applicant. *See* section 291 of the Act, 8 U.S.C. § 1361 (1988); *Matter of Matelot*, 18 I&N Dec. 334, 335 (BIA 1982) (holding that absent a colorable claim to lawful permanent resident status, the relevant burden is upon the alien). In this case, therefore, the applicant must bear the burden of showing the three elements necessary for establishing an entry, namely, (1) physical presence, (2) actual and intentional evasion of inspection at the nearest inspection station, and (3) freedom from official restraint. *Matter of Patel, supra*, at 4; *Matter of Pierre*, 14 I&N Dec. 467, 468 (BIA 1973).

The Service then argues that the applicant cannot have satisfied that

710

burden in this case for two reasons. First, the Service argues, the evidence in the record is insufficient to establish that the applicant actually and intentionally evaded inspection. The Service suggests that mere flight or hiding does not establish such intent. The Service suggests that the applicant may, for example, have intended to present himself at the nearest inspection station, and that he may have been acting furtively in the meantime in order to evade the smugglers who ran the illegal operation. While such a scenario is not beyond the realm of the theoretically possible, we find, as did the immigration judge, that the documents in the record establish by a preponderance of the evidence that the applicant was not attempting to proceed to the nearest inspection station, but actually and intentionally evaded inspection.

In determining the alien's intent in this context, we are not bound to find that no relevant intent has been established simply because the applicant has remained silent, as the Service seems to suggest. Evidence of intent may be established not only by the applicant's own statements, but also by other evidence in the record, even in the face of an applicant's contrary testimony. *Cheng v. INS*, 534 F.2d 1018, 1019 (2d Cir. 1976) (holding that crossing the border from Canada in a smuggler's van at night without headlights, and turning away from the nearest inspection station, provided "overwhelming" evidence of actual and intentional evasion of inspection); *see also Giacone v. Corsi*, 64 F.2d 18 (2d Cir. 1933); *Matter of Estrada-Betancourt*, 12 I&N Dec. 191, 194 (BIA 1967) (finding that an entry was effected when the aliens did not proceed by the ordinary route to the nearest inspection station).

In the instant case, the unrebutted documentary evidence is most persuasive that the applicant intended to enter the United States illegally. For example, the applicant came to the United States on the *Pai Sheng* in cooperation with a smuggling operation and without travel documents. While the record is silent as to the applicant's own specific arrangements, other passengers of the *Pai Sheng* paid substantial sums to be illegally smuggled to the United States, and there is no reason to believe the applicant was an exception. Further, the applicant, having debarked in San Francisco at night at an abandoned dock, did not seek out United States officials or wait for their arrival. Nor, apparently, did he go to them when they appeared on the scene. In fact, the record appears to reflect that not a single passenger did so. Instead, they all fled the dock area so quickly that, about a quarter of an hour later, when the first enforcement officer arrived to investigate, there was no one left at the docks. Further, when other passengers of the applicant's vessel—and possibly the applicant—saw uniformed officers, they did not request information, ask for asylum, or otherwise

act consistently with a desire to submit themselves for immigration inspection at the earliest opportunity. Instead, they scattered.

Finally, the applicants who were apprehended were relatively broadly dispersed and clearly trying to evade the authorities. Others evaded the authorities successfully and were not apprehended in the enforcement sweeps described above. There is no evidence in the record that a single alien from the *Pai Sheng* at any time deliberately surrendered himself to the authorities for any reason. These circumstances are markedly different from those in the cases upon which the Service relies for support. *See Matter of Phelisna*, 18 I&N Dec. 272, 273 (BIA 1982), *remanded*, 551 F. Supp. 960 (E.D.N.Y. 1982), *appeal dismissed*, 729 F.2d 1444 (2d Cir. 1983) (Board finding no evasion where the applicant was apprehended near the beach and indicated she was seeking immigration officials); *Pierre v. Rivkind*, 643 F. Supp. 669 (S.D. Fla. 1986), *rev'd on other grounds*, 825 F.2d 1501 (11th Cir. 1987) (finding no evasion where the petitioner landed and hid in a mangrove swamp, but came out and did not run away when authorities called to her).

We find on the basis of the foregoing, and particularly in the absence of any evidence to the contrary, that the evidence here establishes that the applicant, who was a passenger on the *Pai Sheng*, actually and intentionally evaded inspection at the nearest inspection station. The documentary evidence in support of this inference is more than sufficient to overcome the Service's speculations in rebuttal that the applicant could theoretically have had other intentions. The Service's first argument is without merit.

The Service's second argument focuses upon the issue of official restraint. The Service argues that the applicant cannot have satisfied his burden of showing an entry because from the time his vessel entered San Francisco Bay to the time he was apprehended, he was never free from official restraint. The Service contends that the radar surveillance of the applicant's vessel, the restricted nature of the federal area into which he debarked and fled, and the establishment of a perimeter around that area by federal law enforcement officials means that the applicant's presence in the United States was at all times under official, albeit sometimes "constructive," restraint.

The Service further suggests that the applicant's situation is similar to that of an alien in an airport who attempts to evade immigration or customs officials by hiding in a restroom area, and who does not thereby effect an "entry."

The Service points out that San Francisco's Presidio area, Fort Point, and the Golden Gate National Recreation Area are federally controlled areas under the jurisdiction of the United States armed services and the United States Department of the Interior. These areas

were closed to the public while the applicant was present within them. The officers who apprehended the aliens of the *Pai Sheng* were, for the most part, officers of the United States Park Police, Military Police, and officers of the Immigration and Naturalization Service. Therefore, the Service urges, the applicant and his fellow passengers from the *Pai Sheng* should be regarded as having been under "constructive restraint" at all times after debarkation.

In support of this argument, the Service submits that under *Matter of Pierre, supra,* an alien has not entered the United States unless he is free from both actual and constructive restraint. *Id.* at 469. Constructive restraint, the Service observes, may in appropriate circumstances consist of mere surveillance. *Id.* Further, such restraint need not be restraint by officers of the Service. *Matter of Patel, supra,* at 374 (quoting *Correa v. Thornburgh,* 901 F.2d 1166, 1172 (2d Cir. 1990)); *Matter of Yam,* 16 I&N Dec. 535 (BIA 1978). Finally, the Service points out, there has been no entry as long as the alien remains in a "restricted area" where "access and egress [are] controlled," and where the alien lacks the freedom "to go at large and mix with the population." *Correa v. Thornburgh, supra,* at 1172; *see also Matter of Patel, supra,* at 371-72, 374; *Matter of Pierre, supra,* at 469.

In the instant case, the Service argues that the applicant was at all times under surveillance or in a restricted area or both, and so he was at all times under constructive restraint and cannot have entered the United States within the meaning of the Act.

We are not persuaded by the Service's characterization of the facts as showing circumstances of "constructive restraint." As noted above, the record establishes that the applicant's fellow passengers, and evidently the applicant as well, planned in advance to evade immigration and customs authorities. Pursuant to these plans, they entered onto dry land within the territorial boundaries of the United States at an area not designated as a port of entry. The applicant, once debarked, did not meet any customs or immigration officials waiting to process his application for admission. Nor did he proceed directly to the nearest inspection station. Instead, he proceeded freely into the United States and fled for some distance into the interior, where he remained for some time. He was under no official constraints or surveillance. Indeed, although there were grounds for suspicion, and although military police discovered a few aliens within a half hour while investigating something else, no United States official knew with any degree of certainty that a large number of aliens were even present until about an hour after they had debarked.

Moreover, the applicant here was free, at the time he debarked and for anywhere from a half hour to 9 hours afterward, to leave the area of Fort Point, the Presidio, and the National Recreation Area, and to

mingle with the general population of San Francisco. Whether this applicant actually did so is of no consequence. As we stated in *Matter of Patel, supra,* "[t]he critical point in such cases is that freedom from official restraint exists, not that such freedom has been exercised." *Id.* at 9; *see also, e.g., United States v. Martin-Plascencia,* 532 F.2d 1316 (9th Cir.), *cert. denied,* 429 U.S. 894 (1976) (finding that an alien at a port of entry effected an entry when he evaded inspectors and fled 50 yards into San Ysidro, California).

In this case, the record establishes that the applicant could have exercised such freedom to move beyond the boundaries of the federal park and military base areas, and that nearly a quarter of his fellow passengers from the *Pai Sheng* actually did so. The Service's own evidence establishes that more than a dozen former passengers of the vessel were apprehended in various parts of the city of San Francisco, after having moved beyond the boundaries of the federal areas mentioned above. About 30 more apparently escaped apprehension altogether and were still at large when the enforcement sweeps ended on May 24, 1993.

In view of the foregoing, we find that the argument that the applicant's situation is analogous to that of an alien hiding in an airport, or awaiting final processing there as in *Matter of Patel, supra,* is entirely unpersuasive. The applicant here landed surreptitiously, fled into the interior, and remained there until he was apprehended. He did not arrive at a port of entry and attempt to hide before normal processing, nor was he apprehended while awaiting final processing in a customs enclosure. He instead avoided processing altogether and fled into a National Recreation Area. The Service's analogy between these two sets of circumstances does not hold.

We find, in short, that the applicant here made an entry into the United States when he debarked from his vessel at a place other than a port of entry and fled into the interior undetected, with every apparent intention of evading immigration inspection. The mere fact that he entered an area which was under federal jurisdiction for reasons unrelated to immigration processing does not render his movement something less than an entry. Since we conclude that the applicant entered the United States prior to his arrest, he can now be removed from the United States only through properly instituted deportation proceedings under section 242(b) of the Act, 8 U.S.C. § 1252(b) (Supp. IV 1992).

In view of the foregoing, the decision of the immigration judge will be upheld, the appeal by the Immigration and Naturalization Service will be dismissed, and the exclusion proceedings will be terminated.

**ORDER:** The appeal by the Immigration and Naturalization Service is dismissed.