# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 01-1851

_____

| | |
|---|---|
| Vuyiswa Yetta Nyirenda; | * |
| Mwinji Elaine Nyirenda; | * |
| Muchemwa John Nyirenda, | * |
| | * |
| Petitioners, | * Petition for Review |
| | * of an Order of the |
| v. | * Board of Immigration Appeals. |
| | * |
| Immigration and Naturalization | * |
| Service, | * |
| | * |
| Respondent. | * |

_____

Submitted: December 13, 2001
Filed: February 6, 2002

_____

Before HANSEN, Chief Judge,[1] HEANEY, and MURPHY, Circuit Judges.

_____

MURPHY, Circuit Judge.

The Immigration and Naturalization Service (INS) commenced deportation proceedings against Vuyiswa Nyirenda (Vuyiswa) and her two children for illegal entry under § 241(a)(1)(B) of the Immigration and Nationality Act (INA), 8 U.S.C. § 1251(a)(1)(B) (1995). Vuyiswa was also charged with alien smuggling under §

_____

[1] The Honorable David R. Hansen became Chief Judge of the United States Court of Appeals for the Eighth Circuit on February 1, 2002.

241(a)(1)(E)(i) of the INA, 8 U.S.C. § 1251(a)(1)(E)(i) (1995).[2] After the immigration judge concluded that Vuyiswa had conceded the smuggling charge, he held a hearing on the illegal entry charges and later ordered petitioners deported but granted voluntary departure to the children. The Board of Immigration Appeals (BIA) affirmed, but granted voluntary departure to Vuyiswa as well. The Nyirendas petitioned for review, and we affirm.

I.

Vuyiswa is a forty four year old native of South Africa who grew up in Zambia. She is divorced, and her children Mwinji and Muchemwa are natives and citizens of Zambia. Vuyiswa entered the United States illegally in 1985, but she obtained temporary resident status in 1988 under a program for farm workers and became a permanent resident in 1990. Her children first entered the United States on visitor visas in 1988 and stayed with her until 1992, but they never obtained resident status. When Vuyiswa lost her job in 1992, she sent her children to live with their father in Zambia. She moved to London for five months and then returned to this country and settled in Minneapolis. Vuyiswa moved her children from Zambia to London in 1994 and paid for their care while they attended school. Problems developed with the care arrangements, however, and Vuyiswa applied for visas for the children to come to the United States, but the applications were denied. She then developed a plan to smuggle them into the country.

Vuyiswa obtained Canadian visas for her children and purchased three roundtrip airline tickets from London to Winnipeg, with an aircraft change in Minneapolis. Vuyiswa had planned not to complete the trip to Winnipeg, but to stay in Minneapolis. Officials at the Minneapolis airport denied her children entry,

---

[2] The INA was amended in 1996, but the parties agree that the amendments do not apply to this matter which arose in 1995.

however. The three then continued on to Winnipeg, from where Vuyiswa mailed their passports and luggage to the United States, rented a car, and set out with her children to drive to Minneapolis.

Vuyiswa drove south from Winnipeg on the morning of February 23, 1995. At 11 a.m., after driving for approximately one hour, she reached the United States border at Pembina, North Dakota. Despite the presence of signs announcing the border and the customs booths across the highway, she drove through the United States checkpoint without stopping. Inspection officials saw her, activated a siren, and sent an inspector to pursue her. The inspector sighted Vuyiswa approximately two miles from the border before she reached the first exit from the highway, and he pulled her over shortly thereafter at the request of border patrol officers.

Vuyiswa initially claimed that her children were United States citizens and that she was returning to the country after taking a short trip to Canada. The officials obtained a copy of her flight itinerary, however, and administered Miranda warnings. Vuyiswa then admitted that her children were not United States citizens, but she claimed that she had not intended to cross the border without inspection but to show her green card and hope that officials would not request identification for her children. Vuyiswa asserts that she was sick and exhausted at the time of the border crossing, that she was listening to loud music in her car, and that she did not hear the siren. She has since been diagnosed as having the HIV virus, and she claims that deportation would deprive her of medical treatment available only in the United States.

On April 12, 1996, an immigration judge ruled that Vuyiswa had conceded the charge of alien smuggling, under § 241(a)(1)(E)(i) of the INA, 8 U.S.C. § 1251(a)(1)(E)(i) (1995), and that she and her children had also illegally entered the country, in violation of § 241(a)(1)(B) of the INA, 8 U.S.C. § 1251(a)(1)(B) (1995), by intentionally evading the border checkpoint and exercising freedom from official

restraint before being apprehended. The judge also concluded that petitioners were not eligible for any waiver of deportability or other relief and ordered them deported, but he granted the children voluntary departure.[3] On March 15, 2001, the BIA issued a final order upholding the findings and conclusions of law of the immigration judge. The BIA also granted Vuyiswa voluntary departure because she had been a person of good moral character during the five years that had elapsed since the decision of the immigration judge. See 8 U.S.C. § 1254(e)(1) (1995).

## II.

Petitioners appeal from the BIA's illegal entry determination under § 241(a)(1)(B) of the INA, arguing that Vuyiswa crossed the border accidentally and without intending to evade inspection and that she was never free from official restraint. The INS responds that she could not possibly have driven through the border checkpoint accidentally and that she was free from official restraint when she traveled out of sight of any law officer for approximately two miles within the United States. We review the BIA's legal determinations de novo but recognize that its interpretation of the INA is entitled to deference. Vue v. I.N.S., 92 F.3d 696, 699 (8th Cir. 1996). Factual findings will be upheld if they are "'supported by reasonable, substantial, and probative evidence on the record considered as a whole.'" Tang v. I.N.S., 223 F.3d 713, 718 (8th Cir. 2000), quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

At the time petitioners crossed the border, § 241(a)(1)(B) of the INA prohibited

---

[3] The immigration judge noted that but for her illegal entry, Vuyiswa would be eligible for a waiver of deportation. Under § 1251(a)(1)(E)(iii) (1995), a permanent resident found to be deportable for smuggling her own children into the United States, in violation of 8 U.S.C. § 1251(a)(1)(E)(i) (1995), may apply to the Attorney General for a waiver of deportation "for humanitarian purposes" or "to assure family unity."

an alien from entering the United States without inspection. 8 U.S.C. § 1251 (a)(1)(B) (1995). Entry was statutorily defined as "any coming of an alien into the United States, from a foreign port or place or from an outlying possession, whether voluntarily or otherwise," 8 U.S.C. § 1101(a)(13) (1995). An entry has several components: (1) a crossing into the territorial limits of the United States; (2)(a) inspection and admission by an immigration officer, or (b) actual and intentional evasion of inspection at the nearest inspection point; and (3) freedom from official restraint. Farquharson v. U.S. Attorney Gen., 246 F.3d 1317, 1321 (11th Cir. 2001); Matter of Z-, 20 I. & N. Dec. 707, 708 (BIA 1993). The immigration judge and the BIA concluded that petitioners had entered the United States because they had intended to evade inspection at the border and had been free of official restraint for approximately two miles until stopped.

Vuyiswa argues that she had not intended to evade inspection but did so accidentally because the checkpoint was not identifiable, she thought the border was still four hours away, she was ill, and she did not hear the siren because she was playing loud music. She notes that the inspector who pulled her over testified that she had been driving at the speed limit and that "she didn't appear...aware" she had crossed the border. She also notes that she had not alerted her children that they were crossing the border, even though her plan had been for them to feign sleep during the crossing. The INS argues that the immigration judge and the BIA were correct in concluding that Vuyiswa could not have crossed the border accidentally in light of all the evidence, including photographs of the Pembina checkpoint and the approaches to it.

Substantial evidence in the record supports the conclusion that the checkpoint was clearly marked. There are several large signs on the highway approaching Pembina which announce the checkpoint, and there is evidence that these signs were present on February 23, 1995. The highway splits into three lanes as it runs through the checkpoint. The checkpoint building abuts the left lane, booths stand alongside

-5-

the middle and right lanes, and there are stop signs and semaphores alerting drivers to stop. A sign on top of an overhang extending over the left and middle lanes states: "United States Border Inspection Station – Pembina, North Dakota."

Petitioners passed through the checkpoint at 11 a.m. on a clear day. Although Vuyiswa claims she was ill, she does not allege how her illness impaired her ability to see the checkpoint. She claims that she followed a truck through the checkpoint in the right lane and that it obscured her view, but testimony by INS officials indicated that no truck had passed the checkpoint without stopping and that the only truck present at the checkpoint when petitioners arrived was one undergoing inspection in a rear area. Although petitioners claim that they did not hear the checkpoint siren, the siren is mounted on a pole adjacent to the right lane, points in the same direction petitioners were driving, and is designed to be loud enough to alert drivers who do not stop. Vuyiswa also admitted that she briefly slowed down when she passed through the checkpoint, then sped up again and kept driving. We conclude that the factual findings of the immigration judge are supported by the evidence.

Credibility findings by an immigration judge are entitled to deference if they have a "legitimate, articulable basis," Hajiani-Niroumand v. I.N.S., 26 F.3d 832, 838 (8th Cir. 1994). Vuyiswa's claims that she neither saw the checkpoint nor heard the warning siren are not credible in light of all the evidence. Her claim that she mistakenly thought the United States border was still several hours away when she crossed the checkpoint is questionable since she also testified that she had stopped twice to ask for directions before reaching the border. She admittedly lied when she initially told both the inspector and the border patrol officers that she had driven into Canada with friends and that her children were United States citizens. She changed her story only after officers had obtained airline records showing that she had flown to Canada, had read her Miranda warnings, and had told her that she could be

-6-

criminally charged for giving false statements. We conclude that the credibility findings here were based on legitimate reasons and deserve deference.

Petitioners also argue that they were never free from official restraint because the inspector had sighted them before they had had an opportunity to leave the highway. Although surveillance may be sufficient to establish constructive restraint, see Matter of Pierre, 14 I. & N. Dec. 467, 469 (BIA 1973), petitioners were out of sight of officials long enough to drive approximately two miles into United States territory. An alien has been found free from official restraint while driving unobserved four tenths of a mile into the United States before being stopped, see Cheng v. I.N.S., 534 F.2d 1018, 1019 (2d Cir. 1976), and while crossing two fences out of view of immigration officials before being captured only fifty yards into the United States and still within the confines of the port of entry, see United States v. Martin-Plascencia, 532 F.2d 1316, 1317 (9th Cir. 1976). Official restraint continues only so long as an alien has "no opportunity to get free" of authorities. United States v. Pacheco-Medina, 212 F.3d 1162, 1165 (9th Cir. 2000) (no entry when officer pursued and immediately caught alien who briefly eluded surveillance by turning a corner). See also Zhang v. Slattery, 55 F.3d 732, 755 (2d Cir. 1995) (no entry where alien was arrested immediately after swimming ashore from grounded ship). We conclude that petitioners were sufficiently free from official restraint to effect an entry because they were driving out of sight of immigration officials while traveling on a highway for approximately two miles within the United States.

For the foregoing reasons, we affirm the final order of the BIA.[4]

---

[4] We note that there are humanitarian aspects to this case that might make it worthwhile for petitioners to apply to the district director for deferred departure.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS,  EIGHTH CIRCUIT.