**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 13-1651**

OSCAR ANGEL DE LEON,

                    Petitioner,

          v.

ERIC H. HOLDER, JR., Attorney General,

                    Respondent.

On Petition for Review of an Order of the Board of Immigration Appeals.

Argued:  May 14, 2014                    Decided:  July 30, 2014

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Petition granted and case remanded by published opinion.  Judge Motz wrote the majority opinion, in which Judge King joined. Judge Duncan wrote a dissenting opinion.

**ARGUED:** Cherylle C. Corpuz, CHERYLLE C. CORPUZ, ESQ. PC, Philadelphia, Pennsylvania, for Petitioner.  Jeffery R. Leist, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.  **ON BRIEF:** Stuart F. Delery, Assistant Attorney General, Ernesto H. Molina, Jr., Assistant Director, Andrew N. O'Malley, Office of Immigration Litigation, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Respondent.

DIANA GRIBBON MOTZ, Circuit Judge:

Oscar Angel De Leon, a Guatemalan national residing in the United States, petitions for review of the decision of the Board of Immigration Appeals (BIA) denying his application for "special rule" cancellation of removal under the Nicaraguan Adjustment and Central American Relief Act (NACARA). For the reasons that follow, we grant the petition for review and remand the case to the BIA for further proceedings.

I.

In 1997, Congress enacted NACARA to amend the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). See Appiah v. INS, 202 F.3d 704, 707 (4th Cir. 2000). NACARA authorizes individuals from certain countries -- including Guatemala -- to seek discretionary relief from removal under the more lenient standards that predated IIRIRA. See Gonzalez v. Holder, 673 F.3d 35, 37 (1st Cir. 2012). Congress passed NACARA to correct a provision of IIRIRA "that would have had the effect of changing the rules in the middle of the game for thousands of Central Americans and others who came to the United States because their lives and families had been torn apart by war and oppression." Appiah, 202 F.3d at 710 (quotation marks omitted).

2

Section 203 of NACARA allows aliens from Guatemala to apply for what is known as "special rule" cancellation of removal. 8 U.S.C. § 1229b.  An applicant for special rule cancellation of removal must satisfy a number of requirements, only one of which is at issue here:  the applicant must prove that he was not "apprehended at the time of entry" if he entered the United States on any occasion after December 31, 1990.  8 C.F.R. § 1240.61(a)(1).

"Entry" into the United States for immigration purposes requires more than setting foot on American soil.  As defined by the BIA, "entry" requires (1) a crossing into the territorial limits of the United States; (2) inspection and admission by an immigration officer or actual and intentional evasion of inspection; and (3) freedom from official restraint.[1]  In re Pierre, 14 I. & N. Dec. 467, 468 (BIA 1973).  This case concerns the meaning of the phrase "freedom from official restraint."

An alien enters free from official restraint only if he experiences some degree of liberty in the United States before the government apprehends him.  Thus, freedom from official

---

[1]  Although we have never formally adopted the BIA's definition of "entry," our published cases addressing the entry question comport with the BIA's standard.  See Chen Zhou Chai v. Carroll, 48 F.3d 1331, 1343 (4th Cir. 1995); Lazarescu v. United States, 199 F.2d 898, 900 (4th Cir. 1952).  Because De Leon does not challenge this standard, we assume, without deciding, that it applies here.

restraint "means that the alien who is attempting entry is no[t] under constraint emanating from the government that would otherwise prevent [him] from physically passing on." Correa v. Thornburgh, 901 F.2d 1166, 1172 (2d Cir. 1990). An alien detained at a border crossing or customs enclosure, for example, cannot claim an "entry" merely because he has technically crossed into United States territory. See, e.g., id. at 1169; Sidhu v. Ashcroft, 368 F.3d 1160, 1165 (9th Cir. 2004).

The BIA has explained that official restraint "may take the form of surveillance, unbeknownst to the alien." Pierre, 14 I. & N. Dec. at 469. Such surveillance constitutes official restraint because an alien who is under surveillance by a government official "lacks the freedom to go at large and mix with the population." Id. An alien kept under surveillance by the government is not free from official restraint even if officials permit him to proceed some distance beyond the border before physically intercepting him. See, e.g., United States v. Gonzalez-Torres, 309 F.3d 594, 599 (9th Cir. 2002). But the critical question is whether the alien is in fact free from official restraint, not whether or how the alien has exercised such freedom. In re Patel, 20 I. & N. Dec. 368, 374 (BIA 1991).

An applicant for cancellation of removal under NACARA must proceed through a "two-step process." Rodriguez v. Gonzales, 451 F.3d 60, 62 (2d Cir. 2006) (per curiam). First, the

4

applicant bears the burden of establishing his eligibility for relief.  That is, he must prove by a preponderance of the evidence that he meets all requirements for special rule cancellation of removal -- including that he entered the United States "free from official restraint."  8 U.S.C. § 1229a(c)(4); In Re G-, 20 I. & N. Dec. 764, 770-71 (BIA 1993).  Second, if the alien "satisfies the statutory requirements, the Attorney General in his discretion decides whether to grant or deny relief."  Rodriguez, 451 F.3d at 62; see also 8 U.S.C. § 1229b(a).

Congress has strictly limited our jurisdiction to review the Attorney General's resolution of NACARA applications.  The denial of special rule cancellation of removal is final and "not subject to judicial review," except for "constitutional claims or questions of law" arising from the denial.  8 U.S.C. § 1252(a)(2)(B), (D); see also Barahona v. Holder, 691 F.3d 349, 353 (4th Cir. 2012).  Such "constitutional claims or questions of law" typically arise from rulings made at the first step of the application process -- whether the alien proved eligibility for relief.  We retain our jurisdiction to review these constitutional and legal questions recognizing that the ultimate granting of relief is "not a matter of right under any circumstances but rather is in all cases a matter of grace" to

5

be determined by the Attorney General.  Rodriguez, 451 F.3d at 62 (quoting INS v. St. Cyr, 533 U.S. 289, 307-08 (2001)).

We review de novo legal questions raised in petitions for review.  Higuit v. Gonzales, 433 F.3d 417, 420 (4th Cir. 2006).  Where, as here, the BIA "issue[s] its own opinion without adopting the IJ's opinion," we review only the decision of the BIA.  Martinez v. Holder, 740 F.3d 902, 908 (4th Cir. 2014).

With this understanding of NACARA in mind, we turn to the underlying facts and procedural history of this case.

II.

Born in Guatemala, De Leon first entered the United States illegally with his uncle in 1988.  During his early years in the United States he travelled among various east coast states performing agricultural work, ultimately settling in Delaware.

In July 2003, a border patrol agent, Galen Huffman, apprehended De Leon north of the Arizona-Mexico border as he returned to the United States from an unauthorized trip to Latin America.  According to Agent Huffman's written report, on July 30, he observed a pickup truck at "milepost nine" of Arivaca Road near Sasabe, Arizona, approximately seventeen miles north of the border.  There, he saw a number of persons attempting to conceal themselves in the truck bed.  Agent Huffman followed the

6

truck eight more miles before stopping it at milepost seventeen and apprehending its passengers, including De Leon.

Shortly after De Leon's apprehension by Agent Huffman, immigration officials released him on bond. He currently resides in Delaware with his wife and his three United States-citizen children.

In 2005, De Leon submitted an application for special rule cancellation of removal under NACARA, as well as applications for other forms of immigration relief. An immigration judge (IJ) denied these applications and ordered De Leon removed to Guatemala. The BIA affirmed the IJ's denial of De Leon's other applications, but concluded that the IJ provided an improper basis for denying NACARA relief.[2] Accordingly, the BIA remanded the case for the IJ to reconsider whether De Leon qualified for special rule cancellation of removal under NACARA.

In May 2010, the IJ held a hearing to reevaluate this issue. The judge determined that De Leon's eligibility for NACARA relief now depended on whether he was apprehended at his "time of entry" when he crossed into the United States in July

---

[2] The IJ had ruled that De Leon failed to document that he registered prior to December 31, 1991 -- a prerequisite for obtaining NACARA relief as a Guatemalan national. But the BIA held that De Leon's credible testimony, in addition to a letter from his attorney verifying that he had registered, satisfied this criterion.

7

2003. Counsel for the government stated that she "th[ought] [De Leon] met all of the other requirements" for NACARA eligibility.

At the hearing, the parties primarily disputed the circumstances surrounding De Leon's return to the United States in July 2003. De Leon contended that he crossed the border on foot several days before July 30, walked for six or seven hours within the United States, stopped to rest at a smugglers' "ranch," boarded a pickup truck, and drove for three more hours before being apprehended near Tucson, Arizona. But the government, relying on Agent Huffman's report, maintained that De Leon boarded a pickup truck in Mexico on July 30 and that he was apprehended later that day when Agent Huffman first observed the truck at milepost nine, seventeen miles north of the border. The government acknowledged that Agent Huffman may have apprehended De Leon "a slight distance away from the border." But, comparing this issue to "extended border search[es]," which officers may conduct without violating the Fourth Amendment if they apprehend an alien within twenty-five miles of the border, the government argued that De Leon was effectively apprehended at the border at his "time of entry" for purposes of NACARA.

The IJ agreed with the government. In an oral ruling, the IJ pointed to numerous inconsistencies in De Leon's testimony and found him not credible as to "the issue of the date and location of his entry and the circumstances surrounding his

8

entry." The IJ found that Agent Huffman provided the most credible evidence regarding De Leon's return to the United States. That evidence showed that De Leon was apprehended "within 25 miles of the border." Borrowing from the border-search context, the IJ held that this qualified as an apprehension "at the border or at the functional equivalent of the border." On this basis, the IJ concluded that De Leon's arrest constituted apprehension "at the time of his entry" into the United States, precluding NACARA relief. She therefore again denied De Leon's application for special rule cancellation of removal under NACARA and ordered him removed to Guatemala.

The BIA affirmed. Perhaps recognizing that different standards govern whether border officials may search aliens near the border without violating the Fourth Amendment and whether such aliens have affected an "entry" for purposes of NACARA, the BIA did not adopt the IJ's rationale. But the BIA did agree with the IJ's "ultimate conclusion" that De Leon failed to meet his burden of proof that he was not apprehended at his "time of entry." The BIA found that Agent Huffman provided "the only credible and reliable evidence" regarding De Leon's entry. In light of this evidence, the BIA recognized that it appeared that De Leon "crossed into the territorial limits of the United States and was intentionally evading inspection." But the BIA

9

held that De Leon failed to present "clear evidence that he was ever 'free from official restraint.'"

De Leon then filed this petition for review.

                              III.

Given our limited jurisdiction over this petition, De Leon accepts, as he must, the facts as found in the proceedings below. Thus, on appeal, he concedes that he entered this country on July 30, 2003, and that on that day Agent Huffman observed him at milepost nine of Arivaca Road -- seventeen miles north of the border -- and took him into custody eight miles later. De Leon similarly accepts that, in order to prove that he was not apprehended at his "time of entry," he must prove (1) a crossing into United States territory, (2) admission by or evasion from an immigration officer, and (3) freedom from official restraint. De Leon Reply Br. 1-2. Further, he recognizes that official restraint may take the form of government surveillance.[3]

De Leon contends that, accepting these facts and applying these principles, the only credible evidence establishes that he

---

[3] Hence, De Leon does not challenge the IJ's adverse credibility ruling or contend that the government bears the burden of proof. And neither do we. Rather, we accept the IJ's adverse credibility ruling and evaluate whether De Leon satisfied his burden of proof in light of the facts found below.

10

entered the United States free from official restraint. He claims the BIA erred as a matter of law in concluding otherwise.

Because the BIA issued its own opinion without adopting the IJ's rationale, we review only the BIA's opinion. Martinez, 740 F.3d at 908. The BIA dismissed De Leon's appeal on the ground that De Leon failed to "present[] clear evidence that he was ever 'free from official restraint.'" Noting that official restraint "may take the form of surveillance, unbeknownst to the alien," the BIA reasoned that it remained unclear "at what point [De Leon] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he had travelled before being detained."

The Attorney General defends the BIA's ruling primarily by emphasizing the applicable burden of proof.[4] The Attorney General contends that, in failing to provide credible evidence regarding the circumstances of his entry, De Leon did not

---

[4] The Attorney General also briefly contends that we must deny this petition because De Leon assertedly challenges (1) the agency's findings of fact, which we lack jurisdiction to review, and (2) the BIA's three-part "entry" standard, which deserves Chevron deference. Both arguments are meritless. First, this case presents a pure question of law, as the many appellate opinions assessing freedom from official restraint confirm. See Sidhu, 368 F.3d at 1164 (citing cases). Second, we need not determine whether the BIA's "entry" standard warrants Chevron deference because, even if it does, De Leon does not challenge this standard. Indeed, he embraces it and asks us to apply it.

11

satisfy his burden of proving an entry free from official restraint.

We disagree. De Leon did indeed bear the burden of proving that he entered the United States free from official restraint. See Pastora v. Holder, 737 F.3d 902, 905 (4th Cir. 2013). But he met that burden by relying on Agent Huffman's written report, which, the BIA expressly found, constituted the "only credible and reliable evidence" in the record and showed that Agent Huffman "first saw" De Leon at milepost nine, seventeen miles beyond the border. That the government, rather than De Leon, offered this evidence makes no difference. As Judge Friendly noted long ago, a party may satisfy his burden of proof by pointing to evidence supplied by his adversary. See United States v. Riley, 363 F.2d 955, 958 (2d Cir. 1966) (explaining that a defendant may meet his burden of proving an affirmative defense by pointing to evidence supplied "by the Government itself"). Of course, a party will rarely introduce evidence that proves his adversary's case. But if he does, nothing prevents the adversary from using that evidence to his benefit.

We applied this principle in United States v. Hicks, 748 F.2d 854, 857 (4th Cir. 1984), where "evidence adduced by the government" -- but never once mentioned by the defendant -- nevertheless provided a basis for the defendant to assert an alibi defense. Numerous other cases confirm that a party may

12

rely on its opponent's evidence to make its own case. See, e.g., United States v. Hairston, 64 F.3d 491, 495 (9th Cir. 1995) (defendant could assert alibi defense even though evidence supporting it was introduced by government); United States v. Ortiz-Rengifo, 832 F.2d 722, 725 (2d Cir. 1987) (government could rely on evidence supplied by the defendant to carry its burden of proof); United States v. Webster, 769 F.2d 487, 490 (8th Cir. 1985) (defendant could rely on "'any' evidence, whether 'defense' evidence or 'government' evidence," to make his case); In re Brogna, 589 F.2d 24, 27 (1st Cir. 1978) (the "government's own evidence . . . without more" satisfied a witness's burden of establishing Fifth Amendment privilege).

The Attorney General offers no reason why this principle does not apply in the immigration context, and we see none. Indeed, recent case law suggests that it does indeed apply in that context. The Third Circuit, for example, has held that State Department country reports "are probative evidence and can, by themselves, provide sufficient proof to sustain an alien's burden" -- without so much as hinting that the alien must supply this evidence himself. Zubeda v. Ashcroft, 333 F.3d 463, 477 (3d Cir. 2003). A number of other courts have relied on documents submitted by the government as evidence helping to demonstrate an alien's eligibility for relief. See, e.g., Gomes v. Gonzales, 473 F.3d 746, 756 (7th Cir. 2007) (granting asylum

13

applicant's petition for review in part because "the State Department Reports themselves" helped establish a well-founded fear of persecution); Chanchavac v. INS, 207 F.3d 584, 592 (9th Cir. 2000) (noting that evidence introduced by the INS "gives us further reason to believe [the alien's] fears are warranted").

Given that government surveillance can amount to official restraint, De Leon came under restraint as soon as Agent Huffman spotted him at milepost nine -- where the BIA found that Agent Huffman "first saw" him and began following him. The BIA did not suggest, let alone find, that before arriving at milepost nine De Leon was under any "constraint emanating from the government that would otherwise prevent [him] from physically passing on." Correa, 901 F.2d at 1172. Before any government official first observed him, De Leon necessarily enjoyed the "freedom to go at large and mix with the population" unconstrained by government surveillance. Pierre, 14 I. & N. Dec. at 469. He therefore entered free from official restraint.[5]

_____

[5] The BIA's citation to Pierre, 14 I. & N. Dec. at 469 -- which parenthetically noted that official restraint "may take the form of surveillance, unbeknownst to the alien" -- could be construed as holding that an alien must also prove that no government official observed him without his knowledge. De Leon argues that this would impose an insurmountable burden, and that no alien could hope to qualify for NACARA relief under this approach. The Attorney General does not disagree. Indeed, the Attorney General expressly rejects as "incorrect" any contention that the BIA imposes this "additional burden." Att'y Gen. Br. 29. The Attorney General suggests that the language from Pierre (Continued)

14

The BIA remarked that neither Agent Huffman's report nor De Leon's testimony established where De Leon crossed the border or the distance he travelled before ultimately being apprehended at milepost nine. Although it is not clear, the BIA may have relied on the absence of evidence on these points to hold that De Leon did not enter the country free from official restraint. The dissent similarly finds importance in the asserted lack of evidence as to the "circumstances of De Leon's entry" -- i.e., "when and how he entered the United States."[6]

But, as the BIA's own published precedent establishes, the "circumstances" that the BIA and the dissent find critical

---

merely affirms the undisputed proposition that government surveillance alone -- as opposed to physical apprehension -- can constitute official restraint. We agree with the Attorney General that Pierre does not require an alien to meet the impossible burden of proving that no government official observed him "unbeknownst to [himself]." The only other appellate court to address the question, albeit in a case where the government bore the burden of proof, came to the same conclusion. See United States v. Castellanos-Garcia, 270 F.3d 773, 776 (9th Cir. 2001).

[6] The dissent suggests that De Leon cannot prevail for one additional reason: his asserted failure to offer credible evidence as to "whether he was observed by a government official" at the time of his entry. The BIA, however, did not deny relief on this ground. Rather, the BIA's sole rationale for denying De Leon's claim was that discussed in text above -- that De Leon had failed to present "clear evidence that he was ever 'free from official restraint' as it is unclear at what point [he] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he had travelled before being detained." Of course, we cannot uphold the BIA's ruling on a ground never relied on by the agency. See SEC v. Chenery Corp., 318 U.S. 80, 94 (1943).

15

simply do not bear on the issue of official restraint.  In the case of In re Z-, 20 I. & N. Dec. 707 (BIA 1993), for example, the BIA concluded that an alien who disembarked illegally in San Francisco and was apprehended some time later "somewhere in the vicinity" of the harbor entered free from official restraint. Id. at 707, 713.  As in this case, the alien bore the burden of proving freedom from official restraint.  Id. at 710.  And as in this case, the record did not reflect the distance the alien travelled, the precise amount of time he spent in the country before being apprehended, or how he occupied this time.  But the BIA found it sufficient that he "could have exercised" his freedom to move about the city.  Id. at 714 (emphasis added). Whether he chose to exercise this freedom was "of no consequence."  Id.[7]

The BIA has adhered to this approach in a number of unpublished decisions affirmed by courts of appeals.  See, e.g.,

_____

[7] The dissent contends that our reliance on In re Z- is misplaced.  But we rely on In re Z- only to show that the BIA itself has previously recognized the irrelevance of the specific factors on which it relied here in denying De Leon relief; i.e. the absence of evidence of "the point [at which De Leon] actually entered the United States, how much time had passed before he was spotted by Agent Huffman, and how far from the border he travelled before being detained."  The dissent apparently believes the BIA should have denied De Leon's claim on the ground that he failed to establish "a lapse in time between his unwitnessed entry and his apprehension."  But the BIA did not deny relief on this ground and so we cannot affirm the BIA on this basis.  See supra n.6.

16

Nyirenda v. INS, 279 F.3d 620, 624-25 (8th Cir. 2002); Cheng v. INS, 534 F.2d 1018, 1019 (2d Cir. 1976) (per curiam). Some of these cases arose under a different statutory provision whereby a finding that the alien entered free from official restraint rendered the alien deportable -- the outcome the government sought in those cases. Here, by contrast, a finding that De Leon entered free from official restraint would qualify him for cancellation of removal -- an outcome the government opposes. The BIA cannot apply its official-restraint standard broadly when broadness favors the government's position and narrowly when it does not. If an agency follows "by settled course of adjudication[] a general policy by which its exercise of discretion will be governed, an irrational departure from that policy" constitutes grounds for reversal. INS v. Yueh-Shaio Yang, 519 U.S. 26, 32 (1996). Indeed, an agency may depart from its own precedent only if it offers a "reasoned explanation" for doing so. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 516 (2009). The BIA failed to provide such a "reasoned explanation" here.

We finally note that every circuit to consider the issue has concluded that an alien first observed by a government agent miles (or less) beyond the United States border has entered free from official restraint -- regardless of whether the party bearing the burden of proof has offered evidence of the

17

"circumstances" of the alien's entry. See United States v. Cruz-Escoto, 476 F.3d 1081, 1085-86 (9th Cir. 2007) (alien first observed 150 yards beyond the border entered free from official restraint even where officer "did not see [the alien] cross the border and could not say how or where [the alien] entered the United States"); Nyirenda, 279 F.3d at 624 (alien stopped after driving "out of sight" for two miles in the United States entered free from official restraint); Castellanos-Garcia, 270 F.3d at 774-76 (alien first seen walking "at least 100 yards from the border" entered free from official restraint even though neither party submitted evidence "about [the alien's] exact point of entry"); Cheng, 534 F.2d at 1019 (alien first discovered driving less than a mile beyond the border entered free from official restraint); United States v. Martin-Plascencia, 532 F.2d 1316, 1317 (9th Cir. 1976) (alien apprehended fifty yards beyond the border entered free from official restraint).[8]  We decline to disregard this overwhelming body of precedent by holding to the contrary.

---

[8] A narrow circuit division has emerged regarding aliens who cross the border unseen but are detected mere yards away. Compare United States v. Cruz-Escoto, 476 F.3d 1081, 1085-86 (9th Cir. 2007) (aliens "who evade government observation while crossing the border are deemed to be free from official restraint, regardless of the distance they travel between entry and arrest") with Yang v. Maugans, 68 F.3d 1540, 1550 (3d Cir. 1995) ("the mere fact that [an alien] may have eluded the gaze of law enforcement for a brief period of time" after entry "is
(Continued)

18

IV.

 For all of these reasons, we grant the petition for review and remand the case to the BIA to consider De Leon's application for NACARA relief in light of the proper legal standard. We express no opinion as to whether De Leon meets all of the criteria for NACARA eligibility. If he is eligible for NACARA relief, such eligibility "in no way limits the considerations that may guide the Attorney General in exercising [his] discretion to determine" whether to accord De Leon relief. Yueh-Shaio Yang, 519 U.S. at 31. The Attorney General retains his authority to determine whether De Leon should be granted special rule cancellation of removal.

PETITION GRANTED AND CASE REMANDED

---

insufficient, in and of itself, to establish freedom from official restraint"). We need not pick a side in this debate, however, because neither line of precedent undermines the conclusion that an alien who rode in a car, undetected, for at least seventeen miles into the United States entered the country "free from official restraint."

DUNCAN, Circuit Judge, dissenting:

It is undisputed that De Leon presents no credible evidence to carry his burden of proving freedom from official restraint upon entry into the United States as required by NACARA. 8 U.S.C. § 1229a(c)(4); In re G-, 20 I. & N. Dec. 764, 770-71 (BIA 1993). Although the majority recites that fact, it fails to recognize its analytical significance. To be clear, I am not, as the majority mistakenly appears to believe, requiring De Leon to prove a negative--i.e. that he was not under official restraint prior to being observed by Agent Huffman. I simply seek to hold him to his statutory burden of presenting some credible evidence regarding the circumstances of his entry into the United States. Because he presents none, not even as to the passage of time, I respectfully dissent.

To establish freedom from official restraint, an applicant must prove that he was "free[] to go at large and mix with the population" between the time he entered the United States and the time he was apprehended. In re Pierre, 14 I. & N. Dec. 467, 469 (BIA 1973). The government acknowledged at oral argument, that had De Leon been found credible by the Immigration Judge, his testimony would have established the circumstances of his entry, and I agree. See Matter of G, 20 I. & N. 764, 777 (BIA 1993).

20

Indeed, as the BIA explained below, the law requires only that De Leon establish the circumstances of his entry into the United States by providing some credible evidence regarding when and how he entered the United States. Joint Appendix 4-5. Here, because De Leon is not credible, we have evidence only of his apprehension by Agent Huffman. We know nothing of the circumstances of De Leon's entry, including whether he was observed by a government official.[*] The absence of evidence is not evidence of absence. Yet, the majority finds Agent Huffman's report sufficient to establish that De Leon

---

[*] In In re Z, 20 I. & N. Dec. 707 (1993), the BIA found both the circumstances of the applicant's entry into the United States and the fact that the record established a lapse in time between his unwitnessed entry and his apprehension relevant in holding that the applicant carried his burden of proving freedom from official restraint. Id. at 708, 713-14. Contrary to the majority's contention, therefore, the BIA quite properly applied its precedent in holding that De Leon failed to establish freedom from official restraint because he failed to present any comparable evidence, or, in fact, any evidence at all to carry his burden of proof. I would equally properly affirm for that reason.

I also feel compelled to once point out yet again that the only thing I would to do is hold De Leon to his statutory burden of presenting some credible evidence regarding the circumstances of his entry into the United States. Had De Leon himself been credible, this would have been enough. The majority strains to give the impression that the dissent would create some untethered obligation out of whole cloth, as opposed to recognizing--as it does not--the burden of proof imposed by law. Were the majority to point to some legally cognizable evidence of the circumstances of entry, I would gladly yield. It proffers none--not the proverbial scintilla. And mischaracterizing the dissent will not fill that analytical void.

"necessarily enjoyed" freedom from official restraint before being observed by Agent Huffman at "milepost nine." Maj. Op. 14. There is no basis whatsoever in the record for this assumption, particularly when it is drawn in favor of the party bearing the statutory burden of proof.

Where "there is no clear evidence of the facts determinative of the entry issue, th[e] case[] ultimately must be resolved on where the burden of proof lies." Matter of G-, 20 I. & N. at 777. Here, the adverse credibility ruling means that we have no evidence regarding De Leon's entry. By holding that De Leon nonetheless prevails, the majority necessarily and without explanation shifts to the government the burden of proving what happened before De Leon was apprehended. This is contrary to law.

Because the majority ignores the significance of the adverse credibility ruling and, as a result, misallocates the burden of proof, I respectfully dissent.