**Alicia AGUILAR DE POLANCO,**
**Petitioner,**

v.

**U.S. DEPARTMENT OF JUSTICE,**
**Attorney General Ashcroft,**
**Respondent.**

**Docket No. 02–4034.**

United States Court of Appeals,
Second Circuit.

Argued: Dec. 16, 2004.

Decided: Feb. 10, 2005.

Bruno Joseph Bembi, Hempstead, NY, for Petitioner.

Andrew M. McNeela, for David N. Kelley, United States Attorney for the Southern District of New York (Sara L. Shudofsky, Assistant United States Attorney, on the brief), New York, NY, for Respondent.

Before: MESKILL, CALABRESI, and WESLEY Circuit Judges.

CALABRESI, Circuit Judge.

Petitioner Alicia Aguilar de Polanco ("Petitoner" or "Polanco") seeks review by this court of the Board of Immigration Appeals' ("BIA" or "Board") decision denying her motion to reopen her deportation proceedings.[1] On appeal, Polanco alleges, *inter alia*[2], that the distinction drawn in § 1505 of the Legal Immigration Family Equity Act Amendments (*hereinafter* "the LIFE Act Amendments") between aliens who are eligible to move to reopen, and those who are not, violates the Equal Protection component of the Fifth Amendment. For the reasons that follow, we conclude that Petitioner's arguments lack merit.

## I. BACKGROUND

Alicia Aguilar de Polanco, a native and citizen of El Savador, entered the United States without inspection on or about April 4, 1985. Approximately four years later, Polanco was served with an order to show cause why she should not be deported. Polanco applied for asylum, temporary withholding of deportation, and voluntary departure. These applications, however, were denied for lack of prosecution when Polanco failed to appear for her final deportation hearing. On November 16, 1990, Polanco was ordered deported *in absentia.* Under the regulations in effect at the time, her order of deportation became final ten days later, when no appeal was taken. *See* 8 C.F.R. §§ 3.36, 3.37, 242.20 (1990).

Sometime before October 31, 1991, Polanco applied for, and was granted, Temporary Protected Status. As a result of this application, Polanco became entitled to certain immigration benefits under the terms of a class action settlement known as the "ABC" settlement. *See American Baptist Churches v. Thornburgh,* 760 F.Supp. 796 (N.D.Cal.1991). Pursuant to the settlement, Polanco was allowed to reapply, *de novo,* for asylum. *See id.* at 799–800. She was also, under the terms of the settlement, allowed to remain in the country pending adjudication of her asylum application, and to receive work authorization for the duration of that period. *See id.* at 804–05. Although the settlement thus enabled Polanco to work and live in this country indefinitely, she remained subject to the possibility of deportation, should her asylum application be denied. *See id.* at 807.

---

**1.** In 1996, Congress replaced "deportation" proceedings with a similar form of proceedings, known as "removal." *See Evangelista v. Ashcroft,* 359 F.3d 145, 147 n. 1 (2d Cir. 2004). For ease of reference, and because Polanco's proceedings are governed by the pre–1996 statutory regime, we refer to both forms of proceedings as "deportation" proceedings.

**2.** Polanco raises several additional challenges to the BIA's failure to reopen her deportation proceedings. These challenges are addressed in a summary order issued in conjunction with this opinion.

In 1996, while Polanco's ABC asylum application remained pending,[3] Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"). *See* Pub.L. No. 104–208, 110 Stat. 3009–543 (1996). IIRIRA made several significant changes to the immigration laws. Among these were the curtailing of the availability of certain forms of discretionary relief from deportation. Particularly relevant here, IIRIRA limited the availability of a form of relief known as "suspension of deportation." Prior to 1996, many non-lawful permanent resident ("LPR") aliens like Polanco were eligible for suspension of deportation if they could demonstrate seven years' physical presence in the United States, coupled with certain specified equitable factors. *See* 8 U.S.C. § 1254(a) (1995) (repealed). IIRIRA enacted a "stop time rule," which dictated that time ceases to accrue towards the seven years physical presence requirement upon the issuance of an Order to Show Cause[4] by the INS. *See* IIRIRA § 309(c)(5) (indicating that time towards the physical presence requirement stops accruing upon the issuance of a "Notice to Appear"); *see also* Nicaraguan Adjustment and Central American Relief Act ("NACARA") § 309(c)(5) (amending IIRIRA § 309(c)(5) to make clear that the stop time rule also applies to proceedings initiated by way of an Order to Show Cause). As a result, aliens like Polanco—who were issued an Order to Show Cause prior to the accrual of seven years' physical presence—became, upon the passage of IIRIRA, ineligible for suspension of deportation.

In 1997, in order to alleviate this and other consequences of IIRIRA, Congress passed the Nicaraguan Adjustment and Central American Relief Act. *See* Pub.L. No. 105–100, 111 Stat. 2193 (1997). Among the modifications made by NACARA, were revisions to IIRIRA designed to allow most ABC class members to apply for suspension of deportation under the pre-IIRIRA rules. *See* NACARA § 203. Because class members who were subject to final orders of deportation would not— by virtue of pre-IIRIRA immigration rules—be able to apply for suspension of deportation without reopening their deportation proceedings,[5] NACARA also included a special provision allowing class members to make a single motion to reopen their deportation proceedings, within a

---

**3.** Although the status of Polanco's ABC asylum application is not entirely clear from the record, it appears that it had not yet been adjudicated as of the time of the events underlying this appeal.

**4.** Prior to the passage of IIRIRA, immigration proceedings were commenced by the service of a charging document referred to as an "Order to Show Cause." IIRIRA modified the nomenclature applicable to immigration proceedings in many respects, including, *inter alia,* replacing the term "Order to Show Cause" with the term "Notice to Appear." *See Rojas–Reyes v. INS,* 235 F.3d 115, 120 (2d Cir.2000).

**5.** Without the reopening of a final order of deportation, neither the Executive Office for

Immigration Review ("EOIR") nor the Immigration and Naturalization Service ("INS") would have jurisdiction to adjudicate an application for suspension of deportation. Prior to 1996, aliens such as Polanco would have been able to seek reopening under relatively relaxed rules. In 1996, however, the EOIR promulgated regulations setting stringent limitations on the granting of certain types of motions to reopen, including, *inter alia,* untimely motions, and motions to reopen *in absentia* deportation orders. *Compare* 8 C.F.R. §§ 3.23, 242.22 (1995) *with* 8 C.F.R. § 3.23 (1997). Thus, in order fully to effectuate the grant of NACARA relief with respect to aliens such as Polanco, a special reopening provision was required.

fixed time period.[6] *See* NACARA § 203(c).

After the passage of NACARA, Polanco retained her current counsel to assist her in obtaining § 203 relief. Although Polanco hired counsel some three months prior to the expiration of the NACARA "single" motion filing deadline, a motion on her behalf was not filed until more than a year after the expiration of the deadline. The Immigration Judge ("IJ"), without further elaboration, denied Polanco's motion to reopen as untimely. Polanco appealed to the BIA.

While Polanco's appeal was pending before the BIA, Congress enacted the LIFE Act Amendments. *See* Pub.L. No. 106–554, 114 Stat. 2763 (2000). The Amendments, which extended NACARA § 203 relief eligibility to certain previously ineligible aliens, allowed these newly eligible aliens to apply for reopening of their deportation proceedings within a fixed time period. *See* LIFE Act Amendments § 1505. Polanco's attorney, apparently misreading the Amendments' reopening provision, submitted additional briefing to the BIA, arguing that Polanco should be allowed to reopen under the Amendments.[7] The BIA dismissed Polanco's appeal, finding that she was not statutorily eligible for reopening under the LIFE Act Amendments, and that her original NACARA reopening motion was untimely.

Polanco filed a timely petition for review with our court.

## II. DISCUSSION

Section 1505 of the LIFE Act Amendments was enacted with the goal of extending NACARA's benefits to a category of aliens previously ineligible for NACARA relief. Prior to the passage of § 1505, aliens who had departed and reentered the country while under a final order of deportation—but who were otherwise eligible for NACARA § 203 relief—were rendered ineligible for § 203 relief by the operation of § 241(a)(5) of the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1231(a)(5) (indicating that an alien found in this country after having voluntarily or involuntarily departed while under a final order of deportation shall have the prior order reinstated, and shall not be eligible for any form of immigration relief). Congress, in enacting the LIFE Act Amendments, made a policy determination that, despite the bar to relief set forth in INA § 241(a)(5), such aliens should be allowed to seek § 203 relief. With this in mind, the LIFE Act Amendments provided that § 203 determinations could be made without regard to INA § 241(a)(5). And, it expressly allowed aliens rendered eligible by the Act to make a single motion to reopen their immigration proceedings, within a fixed time period.[8] *See* LIFE Act Amendments § 1505.

---

6. While NACARA set the parameters for the duration and commencement of the time period during which aliens could move to reopen in order to seek NACARA § 203 relief, the specific start and end dates for the NACARA reopening period were designated by the Attorney General. *See* NACARA § 203(c); Notice: Motion to Reopen, 63 Fed.Reg. 3154–03 (Jan. 21, 1998).

7. Both Polanco's attorney and the BIA treated this aspect of Polanco's claims as arising under the LIFE Act. The provision which Polanco seeks to take advantage of, however, was enacted as part of the LIFE Act Amendments, not the LIFE Act itself.

8. The LIFE Act Amendments, like NACARA, set only general statutory parameters for the duration and commencement of the time period during which aliens could move to reopen. As with NACARA, the specific start and end dates for the Life Act Amendments' reopening period were set by the Attorney General. *See* LIFE Act Amendments § 1505.

■ Polanco is plainly not within the category of aliens made eligible for reopening by the LIFE Act Amendments, and she properly has abandoned any such (statutory) argument on appeal. Instead she contends that the classification drawn by the LIFE Act Amendments—between those who are eligible to reopen under the Amendments, and those who are not—is irrational, and violative of the Equal Protection component of the Fifth Amendment.[9] This argument, we conclude, is without merit.

■ As Polanco correctly notes, continuously present aliens in deportation proceedings are entitled to basic Equal Protection guarantees. *See, e.g., Skelly v. INS,* 168 F.3d 88, 91 (2d Cir.1999). And, we have at times found that classifications drawn by the immigration laws, lacking any rational justification, run afoul of this Equal Protection requirement. *See, e.g., Francis v. INS,* 532 F.2d 268, 273 (2d Cir.1976). We have also made clear, however, that any rational justification will suffice to uphold a classification under the immigration laws. And we will not strike down an immigration law on Equal Protection grounds "if any state of facts reasonably may be conceived to justify it." *Giusto v. INS,* 9 F.3d 8, 10 (2d Cir.1993) (per curiam).

Here, the existence of an adequate justification for the distinction drawn by the Amendments cannot be seriously questioned. Only aliens who were not already afforded the opportunity to move to reopen in order to apply for NACARA § 203 relief are permitted to move to reopen under the LIFE Act Amendments. Preventing aliens from being afforded duplicative opportunities to seek relief is surely within the province of Congress's broad authority to determine the shape of the immigration laws. *Cf. Skelly,* 168 F.3d at 91–92 (the unavailability of suspension of deportation relief in exclusion proceedings is not violative of Equal Protection).

### III. CONCLUSION

For the foregoing reasons, we conclude that the distinction drawn in the LIFE Act Amendments—between those who have previously been afforded the opportunity to move to reopen for NACARA relief, and those who have not—does not violate the Equal Protection component of the Fifth Amendment. The petition for review of the BIA's decision is DENIED, and the decision of the Board of Immigration Appeals is AFFIRMED.

---

9. This argument was raised for the first time on appeal before this court. The government has not argued that it is unexhausted, however, and we therefore do not address the issue of whether exhaustion would otherwise have been required under our precedents.